James PRICE, Lois Green, Peggy Stuart, Andrew Talley, Delores Busch, Anthony Gooden, Toni Cobb, Cynthia Rivers, Patricia Dogma and Tammy Craig, individually and on behalf of all similarly situated persons,

v.

Walter COHEN, individually and in his official capacity as Secretary, Pennsylvania Department of Public Welfare, and Pennsylvania Department of Public Welfare.

Civ. A. No. 83-2024.

United States District Court, E.D. Pennsylvania.

May 27, 1983.

Steve Gold, Paul Bender, Philadelphia, Pa., for plaintiffs.

Stanley Islipakoff, Philadelphia, Pa., John G. Knorr, III, John Krill, Harrisburg, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

Before this court is the question of whether the Commonwealth of Pennsylvania is constitutionally permitted to deny welfare benefits for nine months of the year to those residents who would otherwise be entitled to such benefits for the entire twelve months but for the fact that they are between the ages of 18 and 45 and fail to meet specific categories established by the legislation at issue. After reviewing the stipulated facts and the legislation involved and applying the legal standard of review required in this case, the court determines that the statute is unconstitutional in that it violates the equal protection clause of the United States Constitution.

The challenged statute was enacted by the General Assembly of the Commonwealth of Pennsylvania in April 1983, Act 1982–75, 1982 Pa.Laws 231, amending the Act of June 13, 1967, P.L. 31, No. 21, known as the Public Welfare Code, 62 P.S. § 101 *et seq.* ("Act 75"). Section 10 of Act 75, amending 62 P.S. § 432, divides General Assistance ("GA") recipients into two categories: the "chronically needy," (Act 75 § 10(3)(i)) and the "transitionally needy" (Act 75 § 10(3)(iii)). Chronically needy are those individuals under the age of eighteen (§ 10(3)(i)(A)) or over forty-five years of age (§ 10(3)(i)(B)). Persons between the ages of 18 and 45 are chronically needy only if they: have a "serious physical or mental handicap" (§ 10(3)(i)(C)); are "caretakers" whose presence in the home is required to care for another person (§ 10(3)(i)(D)); suffer from "drug or alcohol abuse" and are

"undergoing active treatment" (§ 10(3)(i)(E)); are "employed full-time" and have earnings not in excess of the current grant levels (§ 10(e)(i)(F)); have had their income fall below the "assistance allowance level" due to a "natural disaster" and are "ineligible for unemployment compensation" (§ 10(3)(i)(G)); and were previously employed full time for at least forty-eight months out of the previous eight years and have exhausted unemployment compensation benefits (§ 10(3)(i)(H)). Those persons categorized as "chronically needy" are authorized to receive assistance benefits for the full calendar year (§ 10(3)(ii)). The "transitionally needy," those who do not qualify as "chronically needy," are authorized to receive benefits "only once in any twelve-month period in an amount not to exceed the amount of ninety days' assistance" (§ 10(3)(iii)). These are individuals "who are otherwise eligible for general assistance" (§ 10(3)(iii)).

The legislation includes a five percent increase in the level of grants for general assistance and aid to families with dependent children, effective July 1, 1982, unless the Commonwealth is enjoined from implementing section 10 of Act 75 (Act 75 § 20(a), (b)). The grant increase is required to be suspended if such a court order is issued. Act 75 also contemplates the establishment by the Commonwealth of Community Work Programs to provide jobs and training for general assistance recipients (Act 75 § 5).

The complaint was brought by the named plaintiffs individually[1] and on behalf of all similarly situated persons. They are all between the ages of 18 and 45 and fail to come within the exceptions to the transitionally needy category. They would be recipients of general assistance benefits but for the fact that they are categorized as transitionally needy due to their age. Their entitlement requires them to register with the Department of Public Welfare for employment and training and they may not refuse a bona fide offer of employment. 62 P.S. § 405.1.

**1.** Plaintiffs Delores Busch and Lois Green have withdrawn as plaintiffs.

It is the plaintiffs' contention that "the line drawn by the Act on the basis of age between transitionally and chronically needy persons is utterly and completely irrational in view of the explicit purpose of the Pennsylvania Welfare Code to provide aid for 'all ... needy and distressed' residents of Pennsylvania Nor [sic] does any other legitimate governmental purpose support the total denial of general assistance for nine months of every year to needy persons merely because they are between 18 and 45 years of age.... The irrational classifications contained in the Act violate the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States." (Complaint, ¶ 4). They seek a preliminary and permanent injunction. All parties have agreed that because the evidence to be presented for both the preliminary and permanent injunction would be the same, the court is able to proceed directly to the permanent injunction.

Defendant Walter Cohen and the Pennsylvania Department of Public Welfare ("DPW") deny that the legislation is irrational. It is their contention that the age classification bears a rational relationship to a legitimate state interest and that the state, in allocating limited funds, makes funds available to the most needy Pennsylvania residents and limits general assistance benefits in the case of persons able to seek and obtain employment.

### I.

The parties have stipulated to certain facts in plaintiffs' exhibit 1. They have also stipulated to the accuracy and admissibility of the March 1980 Characteristics of General Assistance Families. As of that date, the age of 48.5% of the "payees" was between 21 and 34 years of age, the highest grade or level of school completed by 72.3% of the "payees" was "some high school, did not graduate" and "high school" with 14.9% being "8th grade or less," the occupation of 24.4% of the "payees" was "blue collar/laborers except farmers" with the next highest percent of 18.4% being "service

workers/service workers except private household," followed by 11.1% "never employed." A fourth category, called "Duration of Assistance Since Most Recent Opening," breaks down by six-month and year categories the percent of general assistance recipients on general assistance funds for certain lengths of time since the last time their case was opened. 66.8% were on general assistance for less than three years.

The plaintiffs have presented the deposition of Don J. Stowall who is the Executive Director of the Philadelphia County Assistance Office. He is responsible for administering the income maintenance programs in the County of Philadelphia, including the General Assistance Program. He testified that the welfare grant for a single person is $172 a month. This payment level depends upon the person's income and resources and does not vary according to age. The state does not take into account "potentially-available income," meaning income from parents or kin or a job that may begin in a few months. The state does not require a person to ask his or her relatives for financial support before determining the recipient's level of need if the person is over 21 years of age.

The court also heard testimony from Janice Madden who has a Ph.D. in Economics with a field of expertise in labor economics. She testified to her familiarity with the statistics on the characteristics of the class of persons who qualify for general assistance under the Pennsylvania Welfare Code as either "chronically" or "transitionally" needy persons. She also testified to her familiarity with the relationship between these various characteristics and the potential employability of such persons in the labor market. It was her expert testimony that persons who qualify for general assistance under either category of need tend to be the least employable of the unemployed residents of Pennsylvania.

It was Dr. Madden's expert opinion that, based on her familiarity with the classifications set out in the statute and the characteristics relating to employability there is absolutely no difference, in terms of ability

to obtain employment, between a person under 45 years of age and a person over 45. Dr. Madden testified that the two factors that correlate to the length of time it takes to find a job are skills and education. Age is not a factor in assessing the employability[2] of those persons eligible for general assistance. While this court has agreed to take judicial notice of the fact that age discrimination in the employment area is a concern expressed by Congress through the Age Discrimination in Employment Act ("ADEA"), Pub.L. 90–202, 81 Stat. 602 (1967), *as amended,* Pub.L. 95–256, 92 Stat. 189 (1978), 29 U.S.C. § 621 *et seq.* (1982), Dr. Madden testified that ADEA cases essentially remedies age discrimination faced by persons in supervisory and middle level management positions. Such persons, according to Dr. Madden, are skilled, well-educated workers. Statistically, persons on general assistance tend to be unskilled and less educated. This testimony is borne out by the stipulated facts. She further testified that age discrimination does not exist with regard to the kinds of jobs generally filled by persons bearing the characteristics of the general assistance population.

When asked about her knowledge of the legislated job training programs that were authorized to be established by Act 75, Dr. Madden testified that, to her knowledge, no such program had been started in Philadelphia. The defendants have not rebutted this statement.

Dr. Madden disputed the affidavit submitted by Dr. George Baker, III, on behalf of the defendants. He stated, at number 5 on his affidavit, that his "experience and research indicates that the 45 and older group has certain disadvantages which makes them more vulnerable and in greater need of assistance." Dr. Madden stated that Dr. Baker's conclusions are based on the general population rather than the general assistance population.

Dr. Baker, who also testified before the court, was offered by the defendants as an expert on the vulnerability of older persons. It is clear that his field of expertise is as a biomedical researcher and that much of his research and publication is in the area of the aging of drosphilia, commonly known as fruitflies. Dr. Baker, while lately involved in older worker programs, essentially is able to testify as an expert on the biological effects of aging. He has had no course work in labor statistics or economics. This court will give appropriate weight to Dr. Baker's affidavit and testimony with regard to employment statistics based on his expertise in that area. Furthermore, Dr. Baker testified that the tables and conclusions drawn from the tables in his affidavit are based on the general population rather than the general assistance population. It is clear from Dr. Madden's testimony and affidavit that the characteristics of these populations are significantly different in terms of employment prospects and the factor of age with regard to employment.

## II.

"Under traditional equal protection analysis, we ask whether the challenged classification is rationally related to a legitimate governmental interest." *Medora v. Colautti,* 602 F.2d 1149 (3d Cir.1979) (citing *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (footnote omitted). Although the defendants ask this court to rely solely on this rational relationship test, the plaintiffs argue that under *Medora* we are required to apply a level of "heightened scrutiny." Although *Medora* claimed to be applying the rational relationship test, it is clear that the court invoked this heightened level of scrutiny when it stated, "[A]s discrepant treatment becomes purposeful, and if it involves denial of all aid rather than allocation of amounts of aid, the courts will more closely examine the rationality of the underlying classification." *Medora* at 1154. While *Medora* accounted for the fact that the receipt of welfare benefits is not a

---

**2.** Employable means able bodied and capable of working and does not imply that there are jobs available.

fundamental right, it relied on this heightened scrutiny to "protect[ ] the rights of both the state and the burdened class members." *Id.* The plaintiffs contend, however, that even if this court were to apply the minimum equal protection standard, the classification should fail.

The defendants argue that *Medora* is factually distinguishable because in that case the Third Circuit struck down a state regulation which the defendants characterize as having had the effect of excluding a certain group of disabled persons from general assistance while granting general assistance to nondisabled persons. By contrast, defendants argue, Section 10 of Act 75 grants more benefits to those with greater need and does not bar any class from receiving general assistance. The distinction escapes this court. It is far from clear how those persons between the ages of 18 and 45 who have previously been employed full time for at least forty-eight months out of the previous eight years and have exhausted their unemployment compensation prior to applying for assistance (§ 10(3)(i)(H)) are more needy than those who have not been so employed. The former are classified as "chronically needy" and are therefore entitled to benefits for a full year while the latter are classified as "transitionally needy" and are therefore denied benefits for nine months of the year. Although the defendants correctly argue that the transitionally needy are not barred from receiving benefits, there is no doubt that the legislation prevents them from receiving benefits for any period of time beyond the receipt of benefits equalling ninety days' assistance (§ 10(3)(iii)).

This court finds *Medora* controlling. That case reviewed a regulation promulgated under Pennsylvania's general assistance program. The regulation it struck down was one that totally denied general assistance. Because the legislation involves essentially the same result, that is, the total denial of benefits to otherwise eligible recipients of general assistance benefits, the court perceives no reasonable basis to distinguish the case from *Medora.*

The classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relationship to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). The purpose of the legislation in this case is:

> [t]o promote the welfare and happiness of all the people of the Commonwealth, by providing public assistance to all of its needy and distressed; that assistance shall be administered promptly and humanely with due regard for the preservation of family life, and without discrimination on account of race, religion or political affiliation; and that assistance shall be administered in such a way and manner as to encourage self-respect, self-dependency and the desire to be a good citizen and useful to society. Pa.Stat. Ann. tit. 62, § 401.

The plaintiffs highlight the purpose as being the "providing of public assistance to all of its needy and distressed" while the defendants highlight the purpose as encouraging self-dependency. The defendants further state, pointing to legislative history, that the purpose of Act 75 in particular is to "attack welfare fraud and the abuses which are rampant in this system." *Pennsylvania Legislative Journal* (House), March 24, 1982, p. 729 (remarks of Rep. Punt).

In *Medora* the court read the legislative purpose of Pennsylvania's general assistance program to be to provide welfare benefits to all of Pennsylvania's needy and distressed citizens. *Medora* at 1151. Even if this court were to accept defendants' argument that the purpose of the Public Welfare Code is to "encourage . . . self-dependency," 62 P.S. § 401, the classification of chronically and transitionally needy would still fail. In their memoranda of law, defendants argue that, should it become necessary, those persons categorized as transitionally needy could turn to friends and relatives for support. It does not appear to this court that the interest of encouraging self-dependence is furthered in

this manner. A person faced with no general assistance benefits and no employment prospects cannot learn self-dependence.[3]

■ As *Medora* pointed out, "the classification would still withstand equal protection scrutiny if it rationally furthered some legitimate governmental interest other than that specifically stated in the Pennsylvania legislature's declaration of interest." *Id.* at 1152–1153 (citing *United States Department of Agriculture v. Moreno*, 413 U.S. 528, 534, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973); *Williams v. Wohlgemuth*, 366 F.Supp. 541, 547 (W.D.Pa.1973), *aff'd* 415 U.S. 901, 94 S.Ct. 1604, 40 L.Ed.2d 106 (1974). The two part test is: the government interest must be legitimate and the challenged classification must be rationally related to the furtherance of that interest.

■ The interest of attacking welfare fraud and abuse is assumed to be legitimate by this court. It is not rationally furthered by the wholesale denial of benefits to persons of a certain age regardless of individual circumstances. It is irrational to conclude that persons who are not working full time or whose unemployment is not a result of a natural disaster are abusing the system when they seek assistance.

■ The government also contends that one of the purposes of Act 75 was to redistribute welfare funds for those in need and shift aid from the young and the healthy. In addressing the saving of state funds as a state interest, *Medora* stated:

> While it may be true that saving state funds is a legitimate state interest, where welfare benefits are involved, it is incumbent upon the state to proceed in a manner which achieves that goal while fairly treating similarly situated persons.

602 F.2d at 1153, n. 9.

*Medora* distinguished *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) where the Supreme Court upheld a state regulation which allowed for a difference in amounts of payments under the Federal Aid to Families With Dependent Children ("AFDC"). As *Medora* said:

> *Dandridge* cannot be read broadly to settle the question whether benefits may be totally denied to a class of persons who are similar in all relevant respects to a class of persons who have been granted benefits. *See Buffington v. Beal*, 430 F.Supp. 1281 (W.D.Pa.1977); *Morales v. Minter*, 393 F.Supp. 88, 101 (D.Mass. 1975); *Williams v. Wohlgemuth*, 366 F.Supp. 541 (W.D.Pa.1973), *aff'd*, 416 U.S. 901 [94 S.Ct. 1604, 40 L.Ed.2d 106] (1974).

602 F.2d at 1153, n. 9. This case involves the total denial of benefits for nine months of the year and the distinction as to *Dandridge* applies. This is so because this court accepts the fact that the transitionally needy are similar in all relevant aspects to the chronically needy.

This court is cognizant of the constraints on state funds and strikes down Section 10 of Act 75 while bearing in mind the potential economic ramifications involved. However, we are bound to uphold the Constitution and it appears to this court that this duty can be discharged only by taking this action. We therefore hold that Section 10 of Act 75 discriminates among similarly situated persons and does not rationally further any legitimate governmental interests. Having made this determination, we shall deny the pending motions to intervene. Those parties still seeking to intervene may file with the court whatever papers they deem necessary for the court's review in accordance with this opinion.

---

**3.** As noted earlier, persons on general assistance are required to take a job if it becomes available. Therefore, assuming the proper functioning of DPW, a person remaining on the welfare rolls does not have a job available.