James PRICE, Louis Green, Peggy Stuart, Andrew Talley, Delores Busch, Anthony Gooden, Toni Cobb, Cynthia Rivers, Patricia Dogma and Tammy Craig, indiv. and on behalf of all similarly situated persons,

v.

Walter COHEN, indiv. and in his official capacity as Secretary, Department of Public Welfare, and Pennsylvania Department of Public Welfare, Appellants.

No. 83-1387.

United States Court of Appeals, Third Circuit.

Argued June 21, 1983.

Decided Aug. 17, 1983.

Rehearing and Rehearing In Banc Denied Sept. 12, 1983.

Paul Bender (argued), Stephen F. Gold, Philadelphia, Pa., for appellees.

David C. Toomey, Carolyn Mills, Duane, Morris & Heckscher, Philadelphia, Pa., for amicus, Metropolitan Christian Counsel of Philadelphia, Philadelphia, Pa.

Marvin A. Fein, Deputy City Sol., D.R. Pellegrini, City Sol., Pittsburgh, Pa., for amicus, The City of Pittsburgh.

Seth F. Kreimer, University of Penna. Law School, Philadelphia, Pa., for amicus, American Civil Liberties Foundation, Philadelphia, Pa., Thomas B. Harvey, Jr., Philadelphia, Pa., of counsel.

Joseph Lurie, Galfand, Berger, Senesky, Lurie & March, Philadelphia, Pa., David Wilderman, Pennsylvania AFL–CIO, Harrisburg, Pa., for amicus, Pennsylvania AFL–CIO Philadelphia, Pa.

John G. Knorr, III, Deputy Atty. Gen., Allen C. Warshaw (argued), Deputy Atty. Gen., Chief, Sp. Litigation, Harrisburg, Pa., Ward Williams, Deputy Gen. Counsel, John P. Krill, Jr., Deputy Gen. Counsel, Harrisburg, Pa., Stanley I. Slipakoff, Asst. Counsel, Chief of Litigation, Dept. of Public Welfare, Philadelphia, Pa., for appellants.

Before SEITZ, Chief Judge, and ADAMS and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The Pennsylvania Department of Public Welfare and Walter S. Cohen, Secretary of the Department, appeal from an order of the district court, 565 F.Supp. 657, permanently enjoining enforcement of section 10 of Act 1982–75, which amended the Pennsylvania Public Welfare Code. 1982 Pa. Laws 231, amending 62 P.S. § 432.[1] The district court issued the injunction after concluding that section 10 violated the equal protection clause of the Fourteenth Amendment by discriminating impermissibly on the basis of age. Because we hold that there is a rational relationship between the age-based categories established in section 10 and legitimate state interests, we reverse.

I.

In 1982, the Pennsylvania legislature passed by a narrow margin a series of major changes in the Commonwealth's welfare laws. Act of April 8, 1982, 1982 Pa. Laws 231. Section 10, the provision at issue in this suit, significantly alters the eligibility requirements for state-funded general assistance payments. Under the previously applicable provision, all persons eligible to receive general assistance relief were entitled to payments for twelve months a year. Section 10, in contrast, establishes two categories of needy persons: the chronically needy and the transitionally needy. Only those deemed to be in the former group are eligible for year-round general assistance relief. Those classified as transitionally needy are limited to three months' general assistance payments in any twelve month period.

A chronically needy person is defined by the Act as one who is eligible for general assistance relief and is

(A) A child who is under age eighteen or who is attending a secondary or equivalent vocational or technical school full-time and may reasonably be expected to complete the program before reaching age nineteen.

(B) A person who is over forty-five years of age.

(C) A person who has a serious physical or mental handicap which prevents him or her from working in any substantial gainful activity as determined in accord-

---

1. At oral argument, the plaintiffs conceded that the Eleventh Amendment bars actions such as this one against agencies of the *Commonwealth, Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978); *Laskaris v. Thornburgh,* 661 F.2d 23 (3d Cir.1981), and consequently agreed that the Department should be dismissed from the suit.

ance with standards established by the department. . . .

(D) A person who is a caretaker. . . .

(E) A person suffering from drug or alcohol abuse who is currently undergoing active treatment in an approved program. No individual shall qualify as chronically needy under this clause for more than nine months.

(F) A person who is employed full-time and who does not have earnings in excess of current grant levels.

(G) Any person who is ineligible for unemployment compensation and whose income falls below the assistance allowance level as a result of a natural disaster as determined by the department.

(H) Any person who has previously been employed full-time for at least forty-eight months out of the previous eight years and has exhausted his or her unemployment compensation benefits prior to applying for assistance.

1982 Pa. Laws 231.

The transitionally needy are all persons eligible for general assistance relief who are not classified as chronically needy. The distinction between the two groups is essentially an age distinction. Those eligible persons younger than eighteen or older than forty-five are deemed chronically needy. Persons between eighteen and forty-five are classified as transitionally needy, unless they meet one of the additional enumerated requirements. 1982 Pa. Laws 231.

The statutory classifications are not rebuttable. Thus a person between the ages of eighteen and forty-five, who does not fall within one of the specific enumerated categories of chronically needy, is not permitted to establish eligibility for year-round general assistance relief by showing that he or she is in fact totally unable to support him or herself. Even if such a person could show both total destitution and good faith efforts to find employment, he or she would not be entitled to more than three months of general assistance per year.

II.

The original plaintiffs in this action were ten named individuals between the ages of eighteen and forty-five, who alleged that they were unable to maintain a "decent and healthful standard of living" without receipt of public assistance. Each asserted a willingness to work, but claimed to have been unable to find employment. Two of the original plaintiffs withdrew from the case before the district court entered its order on May 27, 1983. The remaining eight plaintiffs claim to represent a class of similarly situated persons, all of whom have been classified as transitionally needy. The district court did not certify the class, but in its Memorandum Opinion and Order appears to have treated the case as a class action.

Bleak and uncertain futures confront the named plaintiffs. Their sources of public assistance are either wholly exhausted or inadequate to maintain them. Each has already received the ninety day allowance permitted the transitionally needy under section 10, and will therefore be ineligible for further cash payments under the general assistance program until next year. Some, if they succeed in maintaining a residence, will continue to be entitled to other benefits, but the payments under these programs are quite limited: food stamps worth about $2.50 a day, low income energy assistance, and some medical help. Those who are put out on to the streets because of a failure to pay rent or because relatives or friends are unwilling or unable to support them any longer will lose their eligibility for even these meager benefits.

Private charities may provide some relief for some of the transitionally needy, but the affidavits submitted assert that these charities are neither inclined nor equipped to take on responsibility for the extended care and support of indigents. According to the affidavits, Mercy Hospice and the Salvation Army, for example, provide only emergency temporary shelter for the homeless. They limit the amount of time that any individual may remain in their facilities to two or

three weeks. (Declarations of Sister Mary Scullion and Lois Semanision.)

Those who are transitionally needy are, consequently, thrown back on their own very limited personal and familial resources. The affidavits of several of the plaintiffs show that they have moved in with relatives and friends, but fear that those persons will be unwilling and unable to keep them much longer. (Affidavits of Cynthia Rivers and Anthony Gooden.) Other plaintiffs appear to have no family or friends from whom to obtain assistance. (Affidavits of Andrew Talley, Patricia Dogma, and Toni Cobb.) With few skills and little education, the plaintiffs face a difficult job market. One of the named plaintiffs had only three years of education in a rural school and is illiterate, and several operate with serious handicaps such as prison records and past alcohol and drug dependency. Given the high unemployment rate, particularly in certain areas of Pennsylvania, it will be difficult for these persons to find work.[2]

The plight of the two plaintiffs who are pregnant is especially poignant. Pregnant women are entitled in Pennsylvania to certain special benefits designed to insure that they receive proper nutrition and minimally adequate medical care. Under the programs available in Pennsylvania, however, a woman may receive these benefits only if she already has a child; if she is pregnant with her first child, she is not entitled to the benefits. Once the child is born, a mother deemed transitionally needy under the statute may be reclassified chronically needy if she is the caretaker for her infant. During her pregnancy, however, she is limited to the maximum three months general assistance allowed the transitionally needy.

At a time when her health and nourishment are of exceptional importance to her child's development, a pregnant woman is denied assistance. In the case of one plaintiff, there was a possibility that she would be forced out on the street for the entire last trimester of her pregnancy. App. at 147a–148a. We must assume that the legislature and Governor were aware of these potential consequences.

## III.

■ Plaintiffs contend that section 10 discriminates impermissibly among similarly situated persons on the basis of age in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution, which provides that:

No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.

Despite the apparent sweep of its language, the equal protection clause does not require the state to treat all persons alike. *Tigner v. Texas,* 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940). In fact, the Supreme Court has recognized that a legislature "must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982).

■ To establish a violation of the equal protection clause, a plaintiff must show that the allegedly offensive categorization invidiously discriminates against the disfavored group. The level of deference shown to the state-created categories

---

**2.** The district court noted that the parties stipulated to certain facts concerning the characteristics of general assistance recipients as of March 1980. "The age of 48.5% of the 'payees' was between 21 and 34 years of age, the highest grade or level of school completed by 72.3% of the 'payees' was 'some high school, did not graduate' and 'high school' with 14.9% being '8th grade or less,' the occupation of 24.4% of the 'payees' was 'blue collar/laborers except farmers' with the next highest percent

of 18.4% being 'service workers/service workers except private household,' followed by 11.1% 'never employed.' A fourth category, called 'Duration of Assistance Since Most Recent Opening,' breaks down by six-month and year categories the percent of general assistance recipients on general assistance funds for certain lengths of time since the last time their case was opened. 66.8% were on general assistance for less than three years." App. at 12a–13a.

varies according to the group discriminated against and the right or interest infringed. Certain groupings, such as those based on race, are regarded as suspect. As a result, the state may employ racial classifications only if it has a compelling reason to do so. At the other end of the spectrum of judicial scrutiny, regulations that have differing impacts on various types of commercial entities, for example a city ordinance controlling advertising on delivery vehicles, violate the equal protection clause only if they are not rationally related to a legitimate state interest. *Railway Express Agency v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949). The Supreme Court has also applied a middle-tier level of scrutiny to certain classifications which "give rise to recurring constitutional difficulties," such as those based on alienage, gender, or illegitimacy. *Plyler v. Doe,* 457 U.S. at 217, 102 S.Ct. at 2395. These sensitive categories must be substantially related to the achievement of important governmental objectives. *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Regardless of the group discriminated against, the courts will strictly scrutinize governmental actions which seriously burden fundamental rights. The state may, for example, restrict voting, access to the judicial process, and interstate travel only if the limiting classification has been precisely tailored to serve a compelling governmental interest.

## A. The Disadvantaged Class

█ Section 10 disfavors those needy persons eligible for Pennsylvania general assistance relief who are between the ages of 18 and 45 and who do not fit within one of the Act's enumerated categories of chronically needy. The provision denies certain benefits to those in the disadvantaged class on the basis of age, although it attempts to soften the effect of that denial for persons deemed either especially vulnerable or worthy.[3] As the Supreme Court made clear in *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 312–314, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976), age classifications do not trigger heightened scrutiny; they are subject only to rational relation review.

The statute challenged in *Murgia* required all uniformed state police officers to retire at the age of fifty. Explaining its reasons for applying the relatively relaxed rational relationship standard of equal protection analysis, the Supreme Court stated that the class of uniformed police officers over fifty did not possess the characteristics of a suspect class:

[A] suspect class is one "saddled with disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike say, those who have been discriminated against on the basis of race or national origin, have not experienced a "history of purposeful unequal treatment" or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities. The class subject to the compulsory retirement feature of the Massachusetts statute consists of uniformed state police officers over the age of 50. It cannot be said to discriminate only against the elderly. Rather, it draws the line at a certain age in middle life. But even old age does not define a "discrete and insular" group, *United States v. Carolene*

---

3. Secretary O'Bannon's testimony before the Pennsylvania Senate Public Health and Welfare Committee demonstrated great concern that employable persons might accept the too easy alternative of welfare, rather than search for gainful employment. The legislature appears to have made the judgment that certain categories of welfare recipients had demonstrated a commitment to work and thus did not need incentives to get off the welfare rolls: those working full-time, but earning less than current grant levels; victims of natural disasters; and persons with proven work histories of forty-eight months full-time employment in the previous eight years. Supp.App. at 2.

*Products Co.,* 304 U.S. 144, 152–153, n. 4 [58 S.Ct. 778, 783–84, n. 4, 82 L.Ed. 1234] (1938), in need of "extraordinary protection from the majoritarian political process." Instead, it marks a stage that each of us will reach if we live out our normal span. Even if the statute could be said to impose a penalty upon a class defined as the aged, it would not impose a distinction sufficiently akin to those classifications that we have found suspect to call for strict judicial scrutiny.

*Massachusetts Board of Retirement v. Murgia,* 427 U.S. at 313–314, 96 S.Ct. at 2566–67. *See also Vance v. Bradley,* 440 U.S. 93, 96–97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979). If old age does not define a "discrete and insular" group in need of "extraordinary protection from the majoritarian political process," then certainly those between 18 and 45 cannot constitute such a group.

B. *The Right Infringed*

■ When the classification employed by the state burdens the exercise of fundamental rights, strict judicial scrutiny is required. Plaintiffs maintain that because they are destitute and unable to find work, the right at issue in this case is the right to subsist. The right to basic subsistence is arguably the most fundamental of all human rights. For a person who is starving and without shelter, all other rights appear to pale in comparison. As employed by the Supreme Court, however, the term fundamental rights does not mean rights of particular human or societal significance. *San Antonio School District v. Rodriguez,* 411 U.S. 1, 33, 93 S.Ct. 1278, 1298, 36 L.Ed.2d 16 (1973). Rather it means those rights which have their source, explicitly or implicitly, in the Constitution. *Plyler v. Doe,* 457 U.S. at 217 n. 15, 102 S.Ct. at 2395 n. 15.

Nowhere does the Constitution explicitly guarantee the right to receive welfare. Were this a matter of first impression, we might conclude that subsistence is impliedly

protected by the Constitution, because it is of basic human importance and fundamental to the meaningful exercise of all other rights. This is not, however, a matter of first impression. The Supreme Court has considered the issue on numerous occasions and consistently rejected any attempt to require the state to justify its economic and social policies by showing some compelling state interest, *San Antonio School District v. Rodriguez,* 411 U.S. at 33, 93 S.Ct. at 1296, even when "the most basic economic needs of impoverished human beings are at stake." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

■ This Court did suggest in dictum in *Medora v. Colautti,* 602 F.2d 1149, 1153–54 (3d Cir.1979), that courts might apply heightened scrutiny if the categories used by the state totally denied, as opposed to reduced, benefits to a class of persons similar in all relevant respects to the favored group.[4] *Medora* involved a very different situation from the one in this case. First, in *Medora,* plaintiffs challenged a regulation that was in conflict with the statute under which it had been promulgated, rather than as here the statute itself. Second, the regulation in *Medora* required blind, aged, or disabled persons to apply for federal Supplemental Security Income (SSI) benefits before applying for Pennsylvania general assistance benefits. Persons deemed not blind, aged, or disabled, and thus ineligible to receive SSI benefits were permitted to apply for general assistance. However, those found to be blind, aged, or disabled, but still not eligible for SSI for some other reason, were barred from applying for general assistance, even if they would have qualified under the applicable general assistance criteria. This Court concluded that under the lowest standard of scrutiny the regulation violated the equal protection clause, because it was not rationally related to any legitimate governmental interests.

4. We do not reach the question whether by paying the transitionally needy the full benefits allowable under the general assistance program for three months out of twelve, Pennsylvania should be regarded as totally denying them benefits for the other nine months or merely as reducing benefits within the meaning of *Dandridge.*

*See Schweiker v. Wilson,* 450 U.S. 221, 245, 101 S.Ct. 1074, 1088, 67 L.Ed.2d 186 (1981). Despite its broad language, *Medora* does not compel heightened scrutiny in welfare cases, *Jackson v. O'Bannon,* 633 F.2d 329, 339 (3d Cir.1980), and in light of the decision of the Supreme Court in *Dandridge,* we are precluded from applying such scrutiny here.

### IV.

 Under the rational relationship test, challenged legislation will be upheld unless a plaintiff can demonstrate that the classification at issue does not bear a rational relationship to a legitimate state interest. *Matthews v. Lucas,* 427 U.S. 495, 510, 96 S.Ct. 2755, 2764, 49 L.Ed.2d 651 (1976). We cannot say that the interests articulated by the state in this case clearly are not legitimate. Pennsylvania has explained that in creating the distinction between the chronically needy and the transitionally needy, it was attempting to reallocate scarce welfare resources to those most in need, to encourage those best able to adjust to become independent and self-supporting, and to discourage fraud. Those are all legitimate state interests.

 Whether section 10 is rationally related to those interests is a more difficult issue. It is important to bear in mind that the rational relationship test is highly deferential. "A classification having some reasonable basis does not offend against [the equal protection] clause merely because it is not made with mathematical nicety or because in practice it results in some inequality." *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). Indeed, in the area of econom-

ics and social welfare, even "illogical" and "unscientific" approximations by the legislature may suffice. *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

In a series of cases beginning in 1911 with *Lindsley v. Natural Carbonic Gas Co.,* and most recently in *Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981), the Supreme Court has stated that legislative classifications will be upheld under rational relationship scrutiny "if any state of facts reasonably can be conceived that will sustain" them.[5] *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. at 78, 31 S.Ct. at 340. "Where ... there are plausible reasons for [the legislature's] action, our inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislation,' because this Court has never insisted that a legislative body articulate its reasons for enacting a statute." *U.S. Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980) (citations omitted).

While deferential, the rational relationship test is not "toothless."[6] *U.S. Railroad Retirement Bd. v. Fritz,* 449 U.S. at 184, 101 S.Ct. at 464. (Brennan, J., dissenting). As Justice Powell warned in *Schweiker v. Wilson,* "the Court should receive with some skepticism *post hoc* hypotheses about legislative purpose, unsupported by legislative history. When no indication of legislative purpose appears other than the current position of the [government], the Court should require that the classification bear a 'fair and substantial relation' to the asserted purpose." *Schweiker v. Wilson,* 450 U.S. at

---

5. *See Vance v. Bradley,* 440 U.S. 93, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *McDonald v. Bd. of Election,* 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969);

*McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

6. *See Matthews v. Lucas,* 427 U.S. at 510, 96 S.Ct. at 2764; *Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974); *U.S. Dept. of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *U.S. Dept. of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973); *James v. Strange,* 407 U.S. 128, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972).

244–245, 101 S.Ct. at 1087–88 (Powell, J., dissenting); *Delaware River Basin Commission v. Bucks Co.,* 641 F.2d 1087, 1096 (3d Cir.1981). Even this more skeptical approach, however, involves an only "marginally more demanding scrutiny." *Schweiker v. Wilson,* 450 U.S. at 245, 101 S.Ct. at 1088 (Powell, J., dissenting).

### V.

Our inquiry is limited, therefore, to the question whether the Pennsylvania legislature rationally could have believed that section 10's division of general assistance recipients into the categories of transitionally needy and chronically needy reallocated scarce welfare resources to those most in need, encouraged self-dependency, and discouraged fraud. There is no suggestion that these are "*post hoc* hypotheses about legislative purpose." The legislative history contains repeated references to these goals, and the legislature heard testimony that the new classifications would help achieve them. App. at 338a–341a. Helen B. O'Bannon, the then Secretary of the Department of Public Welfare, testified before the Senate Public Health and Welfare Committee, that the Commonwealth's welfare system had become broad in its coverage, but so "shallow" that it failed to provide adequate support for those most in need. She suggested that resources be reallocated by increasing the benefits to those with specified handicaps, and by decreasing the benefits to young, employable persons. During her testimony, she offered statistics purporting to show that these younger recipients tended to have only short-term public assistance needs and were much more likely to engage in welfare fraud. She also voiced the concern that by making welfare too easily available to young people, the Commonwealth was turning them into "dependent victims." Supp.App. at 293a.

The Governor of Massachusetts, Michael Dukakis, presented a statement outlining the experience of Massachusetts with a drastic cut-back in public assistance analogous to the one proposed for Pennsylvania. He explained that Massachusetts had discovered that it had a group of residents who were medically employable, but socially unemployable, and that most of those in that class were over the age of forty. In light of that determination, he recommended specifically that Pennsylvania retain general assistance for those forty-five and older. App. at 25a.

■ This evidence did not go unchallenged. At trial, the plaintiffs presented the essentially uncontroverted testimony of Dr. Janice Madden that the potential employability of persons who qualified for general assistance was unrelated to age. App. 237a–238a; 266a; 289a. In striking down the legislation, the district judge carefully weighed the evidence presented and resolved the conflicting testimony against the Commonwealth. The trial court, however, did not have the authority to do so.

The District Court's responsibility for making "findings of fact" certainly does not authorize it to resolve conflicts in the evidence against the legislature's conclusion or even to reject the legislative judgment on the basis that without convincing statistics in the record to support it, the legislative viewpoint constitutes nothing more than what the District Court in this case said was "pure speculation." *Vance v. Bradley,* 440 U.S. at 111, 99 S.Ct. at 949 (quoting *Firemen v. Chicago, R.I. & P.R. Co.,* 393 U.S. 129 at 138–139, 89 S.Ct. 323 at 328, 21 L.Ed.2d 289).

■ As we emphasized above, the decisions of the Supreme Court have sharply limited our authority to review legislative judgments relating to social or economic programs not involving a suspect class or a fundamental right. We may not compel the state "to verify its logical assumptions with statistical evidence." *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 812, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976), nor may we reject common sense propositions relied on by the state because they are overbroad or underinclusive. *Vance v. Bradley,* 440 U.S. at 111–112, 99 S.Ct. at 949–50. Indeed, in *Jefferson v. Hackney,* the Supreme Court accepted some of the

same factual assumptions relied on by the state here.

> Since budgetary constraints do not allow the payment of the full standard of need for all welfare recipients, the State may have concluded that the aged and infirm are the least able of the categorical grant recipients to bear the hardships of an inadequate standard of living. While different policy judgments are of course possible, it is not irrational for the State to believe that the young are more adaptable than the sick and elderly, especially because the latter have less hope of improving their situation in the years remaining to them. Whether or not one agrees with this state determination, there is nothing in the Constitution that forbids it.

*Jefferson v. Hackney,* 406 U.S. at 549, 92 S.Ct. at 1733.

■ On the basis of the evidence presented to it, the Pennsylvania legislature rationally could have believed that age constituted a relevant difference in the general assistance population and that by distinguishing between the chronically and transitionally needy it was furthering legitimate state interests. This is not to say that the legislature acted wisely or that its conclusions were correct. The material presented was somewhat meager, particularly in light of the profound impact that section 10 will have on the lives of so many Pennsylvanians. The classifications, nonetheless, pass constitutional muster.

### VI.

Considering the importance of the interests at stake, we have considerable doubt about the appropriateness of the extremely deferential approach taken by the Supreme Court in equal protection cases involving rights to basic subsistence. Our doubt, however, does not permit us to deviate from that approach and to demand that the legislature enact a more considered or carefully tailored general assistance program.

Accordingly, the judgment of the district court will be reversed.