466 A.2d 107

**Elaine MARTIN, Appellant,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Appellee.**

Supreme Court of Pennsylvania.

Argued Sept. 23, 1982.

Reargued March 7, 1983.

Decided Sept. 28, 1983.

---

284

John Stember and Joseph Mesar, Neighborhood Legal Services, Braddock, for appellant.

Richard Wagner, Daniel R. Schuckers, Deputy Atty. Gen., Charles G. Hasson, Asst. Counsel, Harrisburg, for appellee.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION OF THE COURT

HUTCHINSON, Justice.

This is an appeal from an order of Commonwealth Court affirming the Unemployment Compensation Board of Review's denial of appellant's application for unemployment compensation benefits. The sole issue raised is whether the statutory scheme chosen by the legislature to determine the levels of monetary earnings qualifying a worker for unemployment benefits [1] violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by creating invidious eligibility classifications. The statute applicable to this case required that claimants earning $3,738.00 or more in their highest quarter also earn the maximum of $6,000.00 in fixed qualifying wages in their base year, with a minimum 20% of such base year wages earned outside their highest quarter. On the other hand claimants earning less than $3,738.00 in their highest quarter had to earn 35% to 38% of their wages outside their highest

1. Sections 401 and 404 of the Unemployment Compensation Law, Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §§ 801, 804.

quarter without any higher fixed constant amount.[2] Since there is a rational basis for this legislative distinction the statute is valid and we affirm the Commonwealth Court's order.

The facts are not in dispute. Elaine Martin, appellant, had been employed by the National Biscuit Company (Nabisco) for three and one-half years on October 18, 1979 when she became unemployed. Because of sporadic lay-offs, she averaged approximately five months of employment per year during that period. On April 22, 1979, appellant filed a claim with the Bureau of Unemployment Compensation. The Bureau found her financially ineligible. The table set forth in section 404(e)(1) of the Act, 43 P.S. § 804(e)(1), provides that a claimant such as appellant, with highest quarter earnings of $2,989.00 during her base year,[3] can qualify for benefits of $122.00 per week, provided she earned total base year wages ("qualifying wages") of $4,800.00. Because appellant's "qualifying wages" during her base year, $4,433.00, were less than the amount required, the Bureau determined her ineligible for benefits.[4]

Following a hearing held on June 7, 1979, a referee upheld the Bureau's determination. Appellant sought further review before the Unemployment Compensation Board of Re-

**2.** The maximum highest quarterly wage currently specified in the Table set forth in Section 404(e)(1) of the Act is $4,688.00 or more, and the corresponding qualifying wage is $7,520.00.

**3.** "Base year" is defined as the first four of the last five completed calendar quarters immediately preceding the first day of an individual's "benefit year" which begins the day on which a valid application is filed. Section 4(a) and (b), 43 P.S. § 753(a) and (b). Appellant's base year was January 1, 1978-December 31, 1978.

**4.** The "step-down" provision of section 404(a)(3), 43 P.S. § 804(a)(3) allows a claimant who has insufficient qualifying wages at the applicable weekly benefit rate to "step-down" four lower rates and, if the claimant has earned the amount of qualifying wages designated for the lowest of those four rates, to become eligible at that lowest rate. Appellant's qualifying wages at the fourth lower weekly benefit rate of $118.00 would have been $4,640.00. The 1980 amendments to the Act reduced the "step-down" provision to the next three weekly benefit rates. Act of July 10, 1980, P.L. 521, No. 108, § 15.

view (Board), appellee. On August 9, 1979 the Board affirmed the finding of financial ineligibility.

Appellant challenged the constitutionality of section 404(e)(1) of the Act, 43 P.S. § 804(e)(1), in her appeal to Commonwealth Court. By opinion and order of January 6, 1982, a panel of the Commonwealth Court affirmed the denial of benefits. 63 Pa. Commonwealth Ct. 629, 439 A.2d 207 (1982). Thereafter, we granted appellant's petition for allowance of appeal. The parties initially argued the appeal before this Court on September 23, 1982, at which the Board was represented by the Attorney General's office. On December 15, 1982, this Court ordered reargument with leave to file supplemental briefs and we invited interested parties and organizations to submit briefs as *amici curiae.* The case was reargued on March 7, 1983 with only the original parties participating.

## I.

The Bureau determines financial eligibility for unemployment compensation benefits by applying Section 404(e)(1), 43 P.S. § 804(e)(1), Table Specified for the Determination of Rate and Amount of Benefits (hereinafter Table) a portion of which is printed as follows:

| Part A<br>Highest<br>Quarterly<br>Wage | Part B<br><br>Rate of<br>Compensation | Part C<br><br>Qualifying<br>Wages | Part D [5]<br><br>Amount of<br>Compensation |
|---|---|---|---|
| $2,888–2,912 | $118 | $4,640 | $3,540 |
| 2,913–2,937 | 119 | 4,680 | 3,570 |
| 2,938–2,962 | 120 | 4,720 | 3,600 |
| 2,963–2,987 | 121 | 4,760 | 3,630 |
| 2,988–3,012 | 122 | 4,800 | 3,660 |

5. The 1980 amendments to the Act split the "Amount of Compensation" column into two columns. Under the present system, a claimant who works 18 to 23 "credit weeks" during her base year is entitled to the amount of compensation specified in Part D while a claimant working 24 "credit weeks" or more is entitled to the compensation set forth in Part E. 43 P.S. § 804(c). Present Part E corresponds to the Part D in effect at the time of the appeal.

| Part A (Cont'd) Highest Quarterly Wage | Part B (Cont'd) Rate of Compensation | Part C (Cont'd) Qualifying Wages | Part D (Cont'd) Amount of Compensation |
|---|---|---|---|
| ******* | *** | ***** | ***** |
| $ 3,713–3,737 | $ 151 | $ 5,960 | $ 4,530 |
| 3,738 or more | 152 | 6,000 * | 4,560 |

* (This figure subject to section 401[a], 43 P.S. § 801[a])

To determine financial eligibility under this Table, a claimant first determines her "highest quarterly wages" (Part A) earned during the base year which, in turn, determines the corresponding rate and total amount of compensation provided in Parts B and D of the Table. However, in order to be eligible for those benefits, the claimant must have earned, in her base year, the amount set forth in Part C, "Qualifying Wages".[6] The "qualifying wage" column when applied in conjunction with the highest quarterly wage column is designed to ensure that a certain percentage of a claimant's wages will have been earned outside of her highest quarter, so as to demonstrate that a claimant has been genuinely attached to the labor force. Throughout the Table, this percentage (a percentage obtained by dividing the amount earned outside the high quarter by the qualifying wages earned during the base year) is in the 35%–38% range, i.e. a claimant had to have earned from 35%–38% of her total base year wages in a quarter or quarters other than her high quarter.[7]

**6.** As discussed in note 4, *supra,* a claimant may also use a "step-down" method to qualify for compensation at a slightly lower rate. 43 P.S. § 804(a)(3). The step-down procedure did not help appellant.

**7.** For persons earning $3,738.00 or less in their highest quarter, the amount of corresponding qualifying wages on the table is calculated by the "multiple of 40-minus-$80" method. Under this method the rate of compensation is multiplied by 40 and $80.00 is subtracted from that amount. For example, a claimant who is eligible for benefits of $50.00 per week must have earned qualifying wages of $1,920.00 in her base year. ($50.00 × 40 = $2,000.00 – $80.00 =

However, a claimant earning the highest quarterly wage specified on the Table, $3,738.00,[8] or more, is referred to section 401(a), 43 P.S. § 801(a), which provides, in relevant portion:

Compensation shall be payable to any employee who is or becomes unemployed, and who—(a) Has, within his base year, been paid wages for employment as required by section 404(c) of this act: Provided, however, that not less than twenty per centum (20%) of the employe's total base year wages have been paid in one or more quarters, other than the highest quarter in such employe's base year.

The crux of appellant's argument is that Part C of the Table operates to require claimants making $3,738.00 or less in their high quarters to have earned 35%–38% of their qualifying wages in another quarter or quarters, while the Table and the so-called "20% minimum rule" of section 401(a) allow those claimants earning more than $3,738.00 in their high quarters to qualify for benefits if as little as 20% of their qualifying wages are earned outside of the high quarter.[9] Appellant argues these two methods of computing

$1,920.00). The result of this variation of the multiple of weekly benefits method when coupled with the step-down provisions described in note 4, *supra,* is that all claimants earning less than $3,738.00 in their highest quarter must earn 35% to 38% of their total base year wages outside their highest quarter.

**8.** The maximum highest quarterly wage currently specified in the Table is $4,688.00 or more, and the corresponding qualifying wage is $7,520.00. *See* 34 Pa.Code § 65.111. The maximum is automatically adjusted each year pursuant to section 404(e)(2), 43 P.S. § 804(e)(2), and regulations of the Board, 34 Pa.Code § 65.112.

**9.** The appellant incorrectly implies that once a claimant earns $3,738.00 in her highest quarter the percentage of earnings outside the highest quarter drops in one discontinuous jump from 35–38% to 20%. In fact there is no precipitious drop from 37% to 20% once a claimant has earned over $3,738.00 in her highest quarter. The assumption of discontinuity ignores the other requirement that she must still earn at least $6,000.00 in base year qualifying wages. Consequently, a claimant earning $4,000.00 in her highest quarter would still have to earn 33% of her income outside her highest quarter and a claimant earning $4,500.00 in her highest quarter would be required to earn 25% of her income outside her highest quarter in order to earn qualifying wages of $6,000.00. Only when a

eligibility create classifications impermissible under the Equal Protection Clause of the Fourteenth Amendment.

Appellant earned $2,989.00 in her highest quarter and $1,444.00 outside her highest quarter. Her qualifying wages were $4,433.00. Based on her hourly rate of $7.00 per hour she worked 427 out of a possible 520 hours in her highest quarter and 206 hours outside her highest quarter.[10] Appellant earned 33% of her qualifying wages outside her highest quarter. By application of Part C of the Rate Table and the "step down" provision of Section 404(a)(3) she failed to qualify for benefits.

She notes that a higher paid employee earning $9.50 per hour but working identical hours would have exceeded the $3,738.00 maximum in Part C and would qualify for benefits with only 31% of her earnings outside the highest quarter. Appellant argues that the only purpose served by permitting persons earning over $3,738.00 in their highest quarter to qualify for compensation benefits with a lower percentage of earnings outside the highest quarter than those earning under $3,738.00 in their highest quarter has no legitimate interest and the sole effect of discriminating against workers with lower hourly wages. However, careful examination of the statutory scheme in question reveals that it was designed to and does serve a legitimate state end even though it does result in some inequality.

## II.

In determining whether this statute violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution we must first determine the appropriate standard of review. The United States Supreme Court has consistently applied only minimal scrutiny to statutory classifications employed in the regulation of

claimant earns $4,800.00 or more in her highest quarter does the minimum 20% requirement control. Thus, the 20% requirement does not introduce a discontinuity into the graph.

10. Based on a maximum of 13 weeks in any quarter with forty working hours in each week.

economic activity or in the distribution of economic benefits so long as those classifications do not discriminate against "suspect classes". If the statutory classification bears some rational relationship to a legitimate state end, it is within the legislative power. *McGinnis v. Royster,* 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973). *See also Commonwealth of Pennsylvania, Department of Public Welfare v. Molyneaux,* 498 Pa. 192, 445 A.2d 730 (1982). Moreover, such a classification does not offend the Equal Protection Clause merely because it "is not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970).

■ "It is by practical experience and not by theoretical inconsistencies that the question of equal protection is to be decided" and it is "no requirement of equal protection that all evils of the same genus be eradicated." *Railway Express Agency v. New York,* 336 U.S. 106, 69 S.Ct. 463, 93 L.Ed. 533 (1949). The Supreme Court has concluded that "the problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Dandridge v. Williams,* 397 U.S. at 485, 90 S.Ct. at 1161 (quoting *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 [1913]; *United States v. Carolene Products Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 [1938] ). *See generally* "Developments in the Law of Equal Protection," 82 Harv.L.Rev. 1065 (1969).[11] Moreover, the legislature need not justify its logical presumptions with statistical evidence. *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 812, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976). *See also Massachusetts Board*

11. Given this standard it is not surprising that for twenty years the United States Supreme Court did not find a state statute in the economic field involving non-suspect classes unconstitutional on equal protection grounds until it struck down an Illinois statute precluding the sale of money orders unless the seller engaged exclusively in that business. *See Morey v. Dowd,* 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957), *ovrld., City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

292 U.S. 307, 96 S.Ct. 2562, 49

of *Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

 In determining whether a classification is rational a court is free to hypothesize the reasons the legislature might have had for its classification. *See Williamson v. Lee Optical*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The courts do not require record evidence to justify the classification nor do they require the legislative history to show that the legislature had considered the particular rationale that satisfies the court. *See Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812, 96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976). *McGowan v. Maryland*, 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). Indeed, the legislative action always carries a strong presumption of constitutional validity. *National Woodpreservers v. DER*, 489 Pa. 221, 414 A.2d 37 (1980) (Opinion by Mr. Justice, now Chief Justice, Roberts) (citing *United States v. Vuitch*, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 [1971]).

The consistency with which the United States Supreme Court has applied these principles to state social and economic policies is illustrated in *Dandridge* where the Court upheld a state law placing an upper limit on the number of children for which any family could receive subsistence payments. Justice Stewart, writing for the majority, concluded that although the classification "involved the most basic needs of impoverished human beings . . . we can find no basis for applying a different constitutional standard." *Id.* 397 U.S. at 485, 90 S.Ct. at 1161. *See also Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972).

Again, in *City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) the United States Supreme Court upheld a law prohibiting pushcart vendors from selling their goods in the French Quarter. The law, in its effect, exempted from the ban only two pushcart vendors who qualified under the ordinance's grandfather clause. In upholding the City ordinance the United States Supreme Court explicitly overruled *Morey v. Dowd*, 354 U.S. 457, 77

S.Ct. 1344, 1 L.Ed.2d 1485 (1957).[12] The *Dukes* Court summarized the equal protection standard as follows:

When local economic regulation is challenged solely as violating the Equal Protection Clause, this Court consistently defers to legislative determinations as to the desirability of particular statutory discriminations. *See, e.g., Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356 [93 S.Ct. 1001, 35 L.Ed.2d 351] (1973). Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. Legislatures may implement their program step by step, *Katzenbach v. Morgan,* 384 U.S. 641 [86 S.Ct. 1717, 16 L.Ed.2d 828] (1966), in such economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations. *See, e.g., Williamson v. Lee Optical Co.,* 348 U.S. 483, 488–489 [75 S.Ct. 461, 464–465, 99 L.Ed. 563] (1955). In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines, *see, e.g., Day-Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 423 [72 S.Ct. 405, 407, 96 L.Ed. 469] (1952); in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment. *See, e.g., Ferguson v. Skrupa,* 372 U.S. 726, 732 [83 S.Ct. 1028, 1032, 10 L.Ed.2d 93] (1963).

427 U.S. at 303, 96 S.Ct. at 2516–2517. *See also* Nowak, Constitutional Law (1978). The United States Supreme

12. *Supra* at 111, note 11.

Court has applied the same standard in reviewing constitutional challenges to a state's eligibility requirement for unemployment compensation. *See Ohio Bureau of Employment Security v. Hodory,* 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977). *See also Idaho Department of Employment v. Smith,* 434 U.S. 100, 98 S.Ct. 327, 54 L.Ed.2d 324 (1977) (An Idaho statute granting unemployment benefits to night students, but denying benefits to otherwise eligible day students, does not deny equal protection).

Recently in *Hodel v. Indiana,* 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) (an equal protection challenge to the Surface Mining and Reclamation Act of 1977) a majority of that Court reiterated its support of this standard of scrutiny for challenges to social and economic legislation.

Social and economic legislation like the Surface Mining Act that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose. *Schweiker v. Wilson,* [450] U.S. [221], 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981); *U.S. Railroad Retirement Board v. Fritz,* [449] U.S. [166], 101 S.Ct. 453, 66 L.Ed.2d 368 (1980). Moreover, such legislation carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality. *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. [59] at 83, 98 S.Ct. [2620], at 2635 [57 L.Ed.2d 595 (1978) ]; *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. [1], at 15, 96 S.Ct. [2882], at 2892 [49 L.Ed.2d 752 (1976) ]. As the Court explained in *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 943, 59 L.Ed.2d 171 (1979), social and economic legislation is valid unless "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational." This is a heavy burden, and appellees have not carried it.

*Id.* at 331–332, 101 S.Ct. at 2386–87. *See also United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1981); *Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981).

While it has been asserted that the foregoing standard represents too narrow a view of the judiciary's responsibility for assessing the validity of legislative action,[13] the standard is a necessary one under the doctrine of separation of powers.

Appellant originally agreed the receipt of unemployment compensation benefits is not a fundamental right nor are the classifications created by the act "suspect" and she conceded that the statute is constitutional if the classifications are rationally related to a legitimate government purpose. *See* Appellant's Brief at 13–14 (July 14, 1982). However, in a Supplemental Brief filed prior to reargument appellant claims for the first time that this Court must follow *Medora v. Colautti,* 602 F.2d 1149 (3d Cir.1979), which applied a "heightened" standard of scrutiny to a Pennsylvania Department of Welfare regulation requiring blind, aged or disabled persons to qualify for social security disability before becoming eligible for general assistance from the Commonwealth. *But see Price v. Cohen,* 715 F.2d 87 (3d Cir.1983). In so holding, the Court of Appeals applied a more demanding middle level of review which the United States Supreme Court has applied when statutory classifications involve sensitive but not suspect classes. *See Califano v. Westcott,* 443 U.S. 76, 96 S.Ct. 2655, 61 L.Ed.2d 382 (1979) (sex); *Lalli v. Lalli,* 439 U.S. 259, 99 S.Ct. 518, 58 L.Ed.2d 503 (1978) (legitimacy); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (sex).

■ Even if we accept appellant's argument that Pennsylvania's unemployment compensation law creates a classification based on "wealth" such a classification does not trigger a heightened standard of scrutiny. *See San Antonio School*

13. See Gunther, "In Search of Evolving Doctrine on a Changing Court, A Model for a Newer Equal Protection," 86 Harv.L.Rev. 1 (1972).

*District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). The Court of Appeals in *Medora* recognized that a classification based on wealth alone would not justify closer scrutiny of the regulation. Rather it based its determination on the fact that the classifications were based on appellee's status as blind, aged or disabled and that the right to "welfare" is "important." c.f. *United States Department of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973); *United States Department of Agriculture v. Murry,* 413 U.S. 508, 93 S.Ct. 2832, 37 L.Ed.2d 767 (1973). *But c.f. Jefferson v. Hackney, supra.*

■ Without questioning the validity of the *Medora* decision on its facts, both the classification and the nature of the right involved in that case are not analogous to appellant's situation. In reviewing the Federal Constitutional challenge to this Commonwealth's unemployment compensation law, we must apply the less stringent "rational relationship" test articulated by the United States Supreme Court in cases involving constitutional challenges to unemployment compensation laws which include non-suspect or sensitive classifications, as here. *Ohio Bureau of Employment Security v. Hodory, supra; Idaho Department of Employment v. Smith, supra. See also Schweiker v. Wilson, supra; United States Railroad Retirement Board v. Fritz, supra.*

As the United States Supreme Court stated in *Daniel v. Family Security Life Ins. Co.,* 336 U.S. 220, 224, 69 S.Ct. 550, 552, 93 L.Ed. 632 (1949):

We are asked to agree with respondents and call the statute arbitrary and unreasonable.

Looking through the form of this plea to its essential basis, we cannot fail to recognize it as an argument for invalidity because this Court disagrees with the desirability of the legislation. We rehearse the obvious when we say that our function is thus misconceived. We are not equipped to decide desirability; and a court cannot eliminate measures which do not happen to suit its tastes if it seeks to maintain a democratic system. The forum for

the correction for ill-considered legislation is a responsive legislature.

Thus, in reviewing appellant's Federal Constitutional challenges based solely on Equal Protection grounds, we are constrained by these firmly established principles.

## III.

■ We turn now to an examination of the general purpose behind the requirement that a claimant earn a percentage of base year earnings outside her highest quarter as a criterion for eligibility. This has traditionally been a statistical surrogate for direct evidence of time worked. Evidence of time worked in a recent period is a legitimate eligibility requirement for unemployment compensation:

> First, it serves to exclude new entrants or reentrants to the work force, who suffer no loss. Second, it is appropriate in an insurance program that there be a period of time in which workers earn their rights and some contributions are paid on their behalf (unlike workers' compensation, where persons are covered from the first day of work). Finally, .... recent work history is part of a series of tests, along with the reasons for termination of the last job and evidence of continuing availability, that establish the work-oriented motives of the applicant. In this sense, "the monetary determination of eligibility," as bureaucrats call the qualifying requirement, is the first screen of a work test.

C. Munts, *Previous Work Requirements and the Duration of Benefits: Unemployment Compensation Studies and Research*, at 3 (1980).

Various methods have been adopted in the numerous jurisdictions which require claimants to earn a percentage of qualifying wages outside their highest quarter as an alternative measure for actual time worked because of the difficulty in obtaining accurate statistics for the latter. All such methods are only rough measures of time actually worked, since the amount of a claimant's earnings in any period is a function of both time and rate of compensation. They have,

nevertheless, survived constitutional challenge. *Ertman v. Fusari,* 442 F.Supp. 1147 (D.C.Conn.1977). Thus, the rational relationship between the requirement that a claimant earn a percentage of income outside the highest quarter to a legitimate government interest is not disputed.

## IV.

We have already explained the mechanics of Pennsylvania's statutory method for establishing attachment to the labor force. Without repeating all of that exigesis here, suffice it to say that the variation of the "multiple of weekly benefits" method used in the applicable Pennsylvania statute to calculate qualifying wages under Section 404 of the Unemployment Compensation Law required claimants receiving $3,738.00 [14] or less as wages in their high quarter to earn 35–38% of qualifying base year wages outside that highest quarter. Claimants earning $3,738.00 or more in their highest quarter were required to earn qualifying wages of $6,000.00 or a minimum of 20% of their qualifying base year wages outside their highest quarter. The necessary rational basis for this legislative decision to require a lower percentage of earnings outside their highest quarter for higher paid claimants appears when we examine the rule in the context of its legislative history.

Prior to the 1964 Amendments to the Unemployment Compensation Law, 1968, Special Session March 24, P.L. —— No. 1, Section 401(a) did not include the proviso that "not less than twenty percentum (20%) of the employe's total base year wages have been paid in one or more quarters, other than the highest quarter in such employe's base year." Prior to 1964 the 35%–38% requirement in the Section 404 table operated uniformly at all eligible wage levels, as in the Connecticut statute upheld against an equal protection attack in *Ertman.* Once a claimant reached the maximum in wages on the table for his highest quarter wage the base year qualifying wage remained fixed. Consequently, the proportion of wages earned outside the highest quarter to

14. $4,688.00 in 1982. *Supra* at 108–109.

qualifying wages earned in the base year decreased as the highest quarterly wage increased. For example, the Rate Table provided in the 1959 amendments to the Act set a maximum qualifying wage of $1,825.00 against a corresponding highest quarter wage of $988.00 or more. Thus, an employee earning $1,825.00 in his highest quarter would have qualified for compensation without earning wages in any other quarter.

Essentially appellant maintains that the legislature did not go far enough when it imposed only a 20% requirement on claimants who earn more in their high quarter than the maximum provided in Part A of the 404(e) Rate Table. Her argument suggests the legislature's policy of encouraging greater attachment to the labor force by imposing a 20% requirement has made the statute unconstitutional by failing to totally eliminate any percentage differential between seasonal and full-time employees. Thus, she says the legislature should have made that percentage uniform regardless of the amount of income earned in one's highest quarter.[15] Let us further examine this argument.

The legislature could well have felt this decreasing percentage of high quarter to qualifying wages reduced the statistical correlation between the earnings device chosen to measure attachment in a particular case. That it did recognize this very problem and introduced the 20% test for high earners to partially meet it, is shown by the 1964 House debate on the subject as set forth below.

In 1964 the legislature was called upon to deal with an unemployment compensation fund which had a deficit of $41,000,000.00. *See* Remarks of Representative K.B. Lee, Legislative Journal-House, Special Session 1964, at 64 (March 20, 1964). In an effort to tighten the criteria for eligibility by making it more difficult for seasonal workers to qualify for compensation, the General Assembly added the 20% minimum proviso, for the first time requiring workers earning at or above the maximum in their highest

15. The legislature had at least two means of dealing with the remaining inequity: by reducing the requirement to a uniform 20% or increasing it to a uniform 35%.

quarter to have earnings in their base year outside that highest quarter. These seasonal employees, who worked intensively for short periods of the year, were generally migrants not then considered to have a bona fide attachment to the Commonwealth's labor force.

In establishing the 20% minimum requirement for workers earning more than the maximum highest quarterly wages on the table, the legislature recognized that it was making it more difficult for all seasonal employees, such as cannery workers for example, and others permanently resident in this state to qualify for compensation. Several legislators opposed the 20% proviso on that very ground. *See* Remarks of Representative Bailey, Legislative Journal-House, *supra* at 52 (March 19, 1964); Remarks of Representative Fineman, *Id.* at 78 (March 20, 1964).[16] Thus, the introduction of the 20% requirement was not intended to benefit higher paid employees. Instead the purpose of the amendment adding an explicit fixed percentage requirement to the statute for those earning maximum qualifying wages was improvement of the correlation between multiple of weekly earnings as a statistical test for attachment to the work force for claimants whose seasonal work is concentrated in their highest quarter. Its effect is to require such claimants to work a greater number of weeks in the base year in order to qualify for compensation. However, the use of the lower 20% requirement for such workers, instead of the table's 35% to 38% requirement for workers earning less than the highest quarter maximum is in fact advantageous to the seasonal worker and ameliorates anomolous denials of benefits to claimants who are in fact fully attached to the work force but in seasonal employment which makes them powerless to correlate their work weeks with the base year calendar.

## V.

When the formula for determining the requisite earnings outside the highest quarter is a function of a fixed percent-

16. Representative Bailey specifically raised the impact of the 20% requirement on women who were heavily employed in seasonal industries.

age of wages in the base year, it becomes increasingly difficult for claimants whose work is concentrated in one quarter to maintain any fixed ratio required to qualify for compensation. Under such a formula, seasonal workers are required to work more weeks outside their high quarter than those in industries without large seasonal fluctuations. In short, the assumption of proportionality between wages earned in the high quarter and the base year is imperfectly correlated to work force attachment and that correlation is particularly poor for workers in a seasonal industry. The following example from Munts, *supra,* which describes the multiple of high quarter earnings method, illustrates that point:

> This is one of the substitute measures for time worked that was selected for administrative simplicity. It is an inaccurate proxy, especially for those who work a small part of the base year. For example, a requirement of earnings at 1¼ times high-quarter earnings would qualify an individual with 8 weeks in the high quarter and 2 weeks outside for a total of 10, but an individual with 13 weeks in the high quarter and 3 weeks outside for a total of 16 would not qualify. Both would have earnings in 2 quarters, but the person with fewer weeks would qualify and the one with a longer work record would not.

*Id.* at 4.

The inequality created by requiring a claimant to earn a fixed percentage of base year wages outside the high quarter regardless of the amount earned in the highest quarter is apparent when we control for rate of compensation. Highest quarter earnings are a function of two variables, rate of compensation and amount of time worked. Prior to the 1980 Amendments to the Act,[17] which have no application to this case, assume a claimant has a fixed wage rate of $500.00 a week and, as appellant would have us hold, the ratio of wages earned outside the highest quarter to base year wages is fixed at 20% for all claimants. Table I (*post* at 117) demonstrates, as the number of weeks worked inside the

17. Act of July 10, 1980, P.L. 521, No. 108, 43 P.S. § 804.

highest quarter increases, the corresponding number of weeks worked outside the highest quarter must also increase in order to maintain a 20% ratio.

TABLE I

| Weeks Worked Highest Quarter [18] | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|
| Highest Quarter Earnings | $2,000 | $2,500 | $3,000 | $3,500 | $4,000 | $4,500 | $5,000 | $5,500 | $6,000 | $6,500 |
| Weeks Required Outside Highest Quarter | 1 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 3 | 4 |
| Earnings Required Outside Highest Quarter | $ 500 | $1,000 | $1,000 | $1,000 | $1,000 | $1,500 | $1,500 | $1,500 | $1,500 | $2,000 |
| Total Weeks Worked | 5 | 7 | 8 | 9 | 10 | 12 | 13 | 14 | 15 | 17 |
| Total Base Year Earnings | $2,500 | $3,500 | $4,000 | $4,500 | $5,000 | $6,000 | $6,500 | $7,000 | $7,500 | $8,000 |

By permitting claimants earning more than the maximum dollar amount in Part A of the Rate Table provided in 404(e) of the Unemployment Compensation Law in their highest quarter to qualify for compensation with a lower percentage of their base year wages earned outside the highest quarter than those claimants earning less than the maximum, the legislature reduced the likelihood of an anomolous denial of benefits to claimants who in effect worked too many weeks in their highest quarter. Thus, the 1964 amendment served its intended purpose of improving the correlation between the statistical test and the reality of work force attachment, without the devastating impact on seasonal workers that

18. Based on a forty hour work week.

imposition of a uniform 35%–38% of earnings outside the highest quarter would have entailed. Conversely, it is clear the legislature in 1964 intended to tighten eligibility, not loosen it, as the judicial imposition of a uniform 20% requirement for all workers would entail.

By way of illustration, let us assume now that in 1964, when the legislature first enacted the 20% rule, it had instead extended Part A (highest quarterly wage) and Part C (qualifying wages) of the 404(e) Table so that claimants were restricted to $152.00 a week compensation under Part B of the Table, and all claimants were required to earn 35–38% of qualifying wages outside their highest quarter. Claimant A (hypothetical) and claimant B (hypothetical) each applied for benefits on April 22, 1979. Claimant A earned $300.00 a week and worked for ten weeks during her highest quarter for a total of $3,000.00. She also worked for six weeks during the rest of her base year earning a total of $1,800.00. Consequently, she had earned qualifying wages of $4,800.00. Since she has earned 37.5% of her wages outside her highest quarter under Part C of the Table, she would be eligible for benefits.

Claimant B earned $300.00 a week and worked thirteen weeks in her highest quarter for a total of $3,900.00. She also worked six weeks during the rest of her base year earning an additional $1,800.00. Because Claimant B did not earn 35–38% of her income outside her highest quarter, she would be ineligible for benefits. However, under the 20% rule, Claimant B would qualify for compensation.

Moreover, lest there remain any lingering suspicion that the 20% compensation requirement was deliberately designed to discriminate against workers earning low rates of compensation, consider the following hypotheticals. Claimant C worked for six weeks in her highest quarter at a rate of $500.00 per week for a total of $3,000.00. She also worked for four weeks outside her highest quarter for a total of $2,000.00. Claimant C thus earned 40% of her base year earnings outside her highest quarter and she would qualify under Table C. On the other hand, Claimant D

worked for 13 weeks in her highest quarter at a rate of $400.00 per week for a total of $5,200.00. She also worked 4 weeks outside her highest quarter for a total of $1,600.00. Claimant D had only earned 23.5% of her earnings outside of her highest quarter and she would fail to qualify. *See also* Remarks of Representative Fineman, *supra,* at p. 78 (including other illustrations).[19]

In each of the above hypotheticals, the claimant with fewer weeks worked would qualify and the one with a longer work record would not. By requiring a lower percentage of earnings outside the highest quarter for persons earning over $3,738.00 per year, the 20% minimum requirement reduced the likelihood that claimants with more weeks worked in both their high and outside quarters would be disqualified for compensation.

The appellant's hypothetical, *supra* at 110 – 111, as well as those included in Mr. Justice Larsen's dissent do show that the statutory scheme results in some unequal treatment between similarly situated claimants. It illustrates an imperfection in our Unemployment Compensation Law's correlation of the proportionality of highest quarter and base year wages to work force attachment. However, as previously illustrated, the flat percentage scheme sought by appellant may punish a claimant with a low rate of compensation who works more weeks in his highest quarter than does a higher paid employee. That method of solving a perceived injustice merely creates another equally onerous classification. In addition, it is totally contrary to the overall intent of the 1964 legislature to tighten eligibility for high earners by requiring better statistical evidence of attachment to the

**19.** If the percentage of wages earned outside the highest quarter to base year wages is set at 20% or any other fixed percentage, similar inequalities result. For example, Claimant A who works for five weeks at $500.00 per week in his highest quarter and two weeks outside his highest quarter at $500.00 per week would qualify at 20%. Claimant B who works for nine weeks in his highest quarter at $200.00 per week and two weeks outside his highest quarter at $200.00 per week would not qualify at 20%.

work force.[20] In either case persons seemingly qualified when compared to selected others are disqualified. Such inequities in the distribution of benefits are an unfortunate concomitant of complex economic-social welfare legislation which must ultimately reflect a balance between legislative efforts to eliminate an evil, e.g., the debilitating effects of unemployment, administrative realities and the problem of allocating scarce financial resources in a complex society. The resolution of such conflicting interests is peculiarly adapted to the legislative process.

 In *Ohio Bureau of Employment Services v. Hodory, supra,* the United States Supreme Court considered a constitutional challenge to a provision of the Ohio Unemployment Compensation Law which excluded from eligibility persons unemployed due to a labor dispute other than a strike. The appellant, an employee at United States Steel in Youngstown, Ohio, had been furloughed through no fault of his own because of a strike by United Mine Workers which cut off the fuel supply at the Youngstown Plant. In upholding the validity of the statute the Court concluded that while the system provides only "rough justice", it is not irrational because it deprived an "innocent" worker of compensation. Here, as in *Hodory* a legislative scheme designed to achieve a legitimate public purpose should not be found unconstitutional because it falls short of perfect justice.

The legislature has apparently recognized that its requirement of a fixed percentage of earnings outside the highest quarter is an inaccurate proxy for establishing time worked outside the highest quarter and, *a fortiori,* job attachment. In 1980 it amended section 404(c) of the Unemployment Compensation Law, 43 P.S. § 804(c), for the first time requiring that *all* claimants work a minimum number of 18 weeks in their base year regardless of the amount of qualifying wages earned.[21] Consequently, it is now impossible for an individual with a fixed rate of pay to qualify for compen-

20. *See Califano v. Wescott,* 443 U.S. 76, 89, 99 S.Ct. 2655, 2663, 61 L.Ed.2d 382 (1979).

21. *Supra,* note 5, at 287.

sation with any less than 27.8% of earnings outside the highest quarter.[22] We will not rewrite this complex statute simply because it did not reflect this statutory refinement at the time appellant filed her claim.

Order of the Commonwealth Court affirmed.

ZAPPALA, J., concurs in the result.

LARSEN, J., files a dissenting opinion in which FLAHERTY, J., joins.

LARSEN, Justice, dissenting:

I strongly dissent from the result reached and the approach taken by the majority, which approach is unsound, illogical and, in several respects, wholly unsupported by precedent or common sense. I fear that today's decision has, for all practical intents and purposes, completely eliminated *any* possibility of a successful challenge to economic or social legislation on Equal Protection grounds in the absence of "suspect" classifications or classifications affecting fundamental rights.[1]

I believe the majority and I are in basic agreement as to the standard of review to be utilized in scrutinizing classifications created by statutory enactments regulating economic and social welfare. An act of the General Assembly will not be declared unconstitutional unless it clearly, palpably and plainly violates the constitution, *Snider v. Thornburg*, 496

22. Because there is a maximum of thirteen weeks in a quarter, in order to work eighteen weeks in the base year a claimant who works the full thirteen weeks in his highest quarter must work a minimum of five weeks outside that quarter. Five is 27.8% of eighteen. Each additional week which a claimant works would increase the ratio of weeks worked outside the highest quarter to weeks worked in the base year. Thus, if he works six weeks outside his highest quarter, the ratio is 33.3%.

1. The majority correctly proceeds upon the premise that the Unemployment Compensation Law does not involve a "fundamental interest" or create "suspect" classifications. Therefore, the traditional equal protection test—whether the classification has a rational relation to a legitimate state interest—is applicable. *See Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977).

Pa. 159, 166, 436 A.2d 593, 596 (1981), and the presumption is in favor of constitutionality with a heavy burden upon the one who challenges the legislation to overcome that presumption. *Milk Control Commission v. Battista,* 413 Pa. 652, 659, 198 A.2d 840 (1964).

In the area of economics and social welfare, absent some "suspect" classification or implication of a "fundamental right", a state does not violate the Equal Protection Clause "merely because the classifications made by its laws are imperfect . . . [or are] not made with mathematical nicety . . . ." *Dandridge v. Williams,* 397 U.S. 471, 484, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). As this Court stated in *Moyer v. Phillips,* 462 Pa. 395, 400–401, 341 A.2d 441 (1971):

The Equal Protection Clause . . . does not deny the state the power to treat different classes of persons in different ways, but does deny the right to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of the particular statute. The classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly circumstanced will be treated alike.

*See Snider v. Thornburg, supra,* 496 Pa. 165–166, 436 A.2d 596, quoting *Moyer.*

Accordingly, the reviewing court must juxtapose the legitimate objectives of the Act, as found in the Act and as offered by the parties, alongside the classifications created by the operation of the 35%–38% ratio contained in the Table, section 404(e)(1), 43 P.S. § 804(e)(1), and the "20% minimum rule", section 401(a), 43 P.S. § 801(a), to determine if the classifications are reasonable, not arbitrary, and bear a "fair and substantial" relation to the objectives. *See Snider v. Thornburg, supra,* 496 Pa. 167, 436 A.2d 597.

It must be recalled that just recently, this Court in *Snider v. Thornburg* gave careful consideration to the appropriate standard of review for classifications created by economic or

308

social legislation. This analysis was necessitated by two lines of cases of this Court which had been interpreted as espousing two different standards of review. 496 Pa. at 166, 436 A.2d at 595–96; *compare Springfield School District v. Department of Education,* 483 Pa. 539, 397 A.2d 1154 (1974) *with Moyer v. Phillips, supra.* A majority of this Court concluded that the two lines of cases were not, in fact, at odds, and firmly established that the test in this Commonwealth is whether the challenged classification is reasonable, not arbitrary, and rests upon a difference having a fair and substantial relation to some legitimate object of the legislation. 496 Pa. at 168, 436 A.2d at 597. We further explained that the "reasonable basis" or "rational basis" for a classification must be a function of the relationship between the classification and the purpose of the legislation. Id. at 436 A.2d 596, *citing,* inter alia, *Commonwealth v. Staub,* 461 Pa. 486, 337 A.2d 258 (1975).

It seems that the majority acknowledges this standard of review,[2] yet by its abject deference to the legislature, the gloss put on the standard all but obliterates this Court's ability, and abdicates our responsibility, to scrutinize legislative enactments for classifications which have no rational basis or bear no reasonable relation to legitimate legislative goals.[3]

2. *See* majority opinion at 111 ("If the statutory classification bears some rational relationship to a legitimate state end, it is within the legislative power. *McGinnis v. Royster,* 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973)."), opinion at 112 (*quoting* from *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976), "our decisions . . . require only that the classification challenged be rationally related to a legitimate state interest.") *and* opinion at 113 (*quoting Hodel v. Indiana,* 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981), "legislative means are rationally related to a legitimate governmental purpose.")

3. While the *Snider v. Thornburg* standard of review is, essentially, that applied by the United States Supreme Court to classifications created by state economic or social legislation which does not involve suspect classes or fundamental rights, it is, indeed, not surprising to find that Court reluctant to invalidate the enactments of state legislatures on equal protection grounds. *See* majority opinion 502 Pa. at 291 n. 11, 466 A.2d at 111, n. 11. Notions of federalism enter into play where the federal courts review such "local" legislation because "[s]tates are accorded wide latitude in the regulation of their local

Accepting, *arguendo,* the validity of the principle that "[i]n determining whether a classification is rational a court is free to *hypothesize* the reasons the legislature might have had for its classification," majority opinion at 111, I cannot agree that a court is free to *conjure* some imagined "rational basis". The majority makes the "hypothesized rational basis" *appear* from seemingly insubstantial matter: "The necessary rational ·basis for the legislative decision to require a lower percentage of earnings outside their highest quarter for higher paid claimants *appears when we examine the rule in the context of its legislative history."* Majority opinion at 115 (emphasis added). This appearance of a "rational basis" takes the form of the following unintelligible statement: "the purpose of the amendment adding an explicit fixed percentage requirement to the statute for those earning maximum qualifying wages was improvement of the correlation between multiple of weekly earnings as a statistical test for attachment to the work force for claimants whose seasonal work is concentrated in their highest quarter." Majority opinion at 116.

It is not only dangerous precedent to ferret out the "necessary rational basis" from such an unlikely source as the "context of [the] legislative history", it is particularly onerous where, as here, the imagined "rational basis" *actually contradicts* the rational basis consistently offered by the Commonwealth as its justification for the classification. The Commonwealth tell us that the purpose of the monetary eligibility scheme here in question is to insure that benefits

economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L. Ed.2d 511 (1976). While the doctrine of separation of powers requires substantial deference to the legislature in the economic sphere, *Snider v. Thornburg, supra,* 496 Pa. at 167, 436 A.2d at 596, the federal judiciary is further restrained from interference with state legislative enactments under our dual federal/state system of government. I submit, however, that even with the heightened deference to state legislatures exhibited by the United States Supreme Court, that Court would find no rational basis or reasonable relationship to legitimate legislative objectives in the statutory scheme presented herein.

are paid only to those employees who have demonstrated a genuine, prior attachment to the labor force. Brief for Appellee Unemployment Compensation Board of Review at 19 and Brief for Appellee Attorney General at 7. The legislature has "measured that prior attachment by reference to two interrelated factors: high quarter earnings and total qualifying wages." Brief for Appellee Attorney General at 7.

The majority acknowledges that the formula comparing high quarterly wages to total qualifying wages ("on the Table", the formula establishes a 35%–38% ratio) is "designed to ensure that a certain percentage of a claimant's wages will have been earned outside of her highest quarter, so as to demonstrate that a claimant has been genuinely attached to the labor force." Majority opinion at 110, 114. However, in the next breath, the majority tells us that the "20% minimum rule" of section 401(a), 43 P.S. § 801(a), was intended both to "tighten up" eligibility (it is difficult to imagine how a 20% ratio "tightens up" eligibility when the ratio established by the Table is a 90% greater measure of attachment) while somehow simultaneously intended to be "in fact advantageous to the seasonal worker and ameliorate anomolous denials of benefits to claimants who are in fact fully attached to the work force but in seasonal employment which makes them powerless to correlate their work weeks with the base year calendar." Majority opinion at 116. Thus, the majority pretends the legislature perceived this measurement from the Table (35%–38%) as "anomolous" when it denies benefits to "seasonal workers", and so enacted the "20% minimum rule" to "ameliorate" the disadvantage to those workers who are not sufficiently attached to the labor force under the Table formula.

Such reasoning is convoluted and contradictory. How can a "seasonal worker" be thought to be any more "fully attached to the work force" than, say, Elaine Martin who has averaged five months of work per year for three and one-half years? Is it because, as the majority postulates, "seasonal employment . . . makes [seasonal workers] power-

less to correlate their work weeks with the base year calendar"? Is Elaine Martin any less "powerless to correlate [her] work weeks with the base year calendar"? It seems to me that "seasonal workers" *by definition* are not "powerless to correlate their work weeks" because a seasonal worker is one who has *chosen to work in a limited season.* Is the housewife who works for a department store during the Christmas season "anomolously" denied benefits because she cannot meet the Table requirements (35%–38%) *which are designed to measure attachment to the labor force?* Is a college student who works construction in the summer "anomolously" denied benefits because he or she cannot fulfill the Table requirements *designed to measure attachment to the labor force?* Is it conceivable that the legislature felt it "anomolous" that those workers who did not fulfill the Table standards for measuring attachment to the labor force were ineligible for benefits, and so enacted legislation designed to make it easier for those less attached claimants to collect benefits? No, it is not conceivable that the legislature "intended" such an incongruous "rational basis".

Such obviously specious reasoning does not befit this Court nor does it supply a *rational* basis or *reasonable* relationship to the legitimate legislative objective. The operative words ("rational" and "reasonable") are rendered inoperative by the majority's analysis. The "intent" attributed to the General Assembly by the majority—that the Table ratio of high quarter to total qualifying wages (set at 35%–38%) was meant to ensure a claimant's genuine attachment, but this measure results in "anomolous" denials of benefits to workers who are not genuinely attached, thus necessitating a substantially reduced measure for those workers—is decidedly *irrational and unreasonable to say the least.*

Moreover, even assuming this "hypothesized" intent of the General Assembly were true and "rational", there are two further reasons why such an intent cannot supply the requisite nexus—the fair and substantial relationship—to the legitimate legislative goal. First, the dichotomy created by

the statutory scheme creating two separate and distinct ratios for measurement of attachment to the work force does not provide an "advantage" to *all* "seasonal workers" as the majority would have us believe. It provides an advantage only to the *higher paid* seasonal workers. In comparing "seasonal workers" who are similarly situated *vis á vis their attachment to the labor force,* i.e. those who have worked a like amount of equally distributed hours in the base year, we find that the lower paid seasonal workers are not at all "advantaged" by the "20% minimum rule".

A seasonal worker, say a migrant farm worker, who has worked for 13 weeks in her high quarter at $200.00 per week ($2,600.00 high quarter earnings) and 4 weeks outside her high quarter at the same rate of pay ($800.00 outside earnings, or $3,400.00 total qualifying wages) is "on the Table" for determining eligibility for unemployment compensation benefits. Her qualifying wage is $4,160.00, so she is denied benefits. The Table requires this worker to have made 37.5% of her earnings outside of her high quarter; she has earned only 23.5%. Being on the Table, this claimant cannot avail herself of the "20% minimum rule".

A highly paid construction worker, on the other hand, has worked for 13 weeks in her high quarter at $500.00 per week ($6,500.00 high quarter earnings) and 4 weeks outside her high quarter at the same rate of pay ($2,000.00 outside earnings, or $8,500.00 total qualifying wages). Being "off the Table", this seasonal worker need only have earned 20% of her earnings outside of her high quarter. Having 23.5% of her earnings in an "outside" quarter, as did the migrant worker, this claimant is eligible for benefits. These two claimants have demonstrated the *exact same* attachment to the labor force, the *only* difference being the rate of pay.

If, in fact, the legislative scheme were "intended" to benefit seasonal workers, it succeeds only in benefitting the *higher paid seasonal workers.* This, of course, is the essence of appellant's argument. That *similarly situated* claimants, i.e., those who are equally attached to the labor force be they seasonal, part-time or permanent workers, are treated

disparately solely on the basis of *rate of compensation* and that this disparate treatment has no rational basis or reasonable relationship to the legislative objective. The majority's hypothetical claimants A and B, "control[led] for rate of compensation", are completely *irrelevant* to our inquiry as these claimants are not *similarly situated vis á vis their attachment to the labor force.* Majority slip opinion, 502 Pa. at 302–304, 466 A.2d at 117, 118.

The second and fundamental flaw in the majority's reasoning regarding the legislature's "hypothesized" intent is that *the General Assembly's intent is also irrelevant.* The majority assures us that the Assembly's intentions were admirable, and so goes to great lengths to attempt to dispel "any lingering suspicion that the 20% compensation requirement was deliberately designed to discriminate against workers earning low rates of compensation." Slip opinion at 28.

It is not apparent who may have harbored this "lingering suspicion". It was certainly not the appellant who has expressed such suspicion. It should go without saying that state legislatures rarely, *if ever,* have enacted legislation "deliberately designed to discriminate". This obvious fact is surely one of the reasons that courts may feel comfortable in presuming the constitutionality of statutes. Nevertheless, though unintended, legislative enactments are occasionally discriminatory *in effect.* Where the effect of a statutory scheme is to create invidious classifications, *it is immaterial that the legislature did not intend such a result.* By allowing the General Assembly's intent to assume such a dominant role in its rationale, the majority has elevated the presumption of constitutionality to an *irrebutable* one in equal protection cases, because a challenger will *never* be able to demonstrate that a statutory classification was "deliberately designed to discriminate".

Even assuming the unassumable and unprecedented approach that the "hypothesized legislative intent" is dispositive, the "intent" attributed to the General Assembly herein cannot withstand scrutiny. Aside from the fact that, as we

have seen, the "hypothesized intent" is neither rational nor reasonable (—it is, rather, arbitrary and illogical and has never been offered as justification by the Commonwealth at any point during this appeal—) and fails to accomplish its purpose (except as to higher paid "seasonal workers"), there is a final, equally fallacious defect in the analysis. The "bottom line" of the majority's position is that two wrongs may make a right. Admitting that the use of two distinct and greatly discrepant ratios to measure attachment is inequitable, majority opinion, 502 Pa. at 291, 466 A.2d at 111, the majority finds this inequity acceptable because, in 1959, the inequity was even worse! *Id.*, 502 Pa. at 299–300, 466 A.2d at 115–116.

The majority informs us that prior to 1964, once a claimant earned the maximum qualifying wage ($1,825.00 in 1959), in her high quarter, there was *no* requirement that the claimant have earned any wages *outside* the high quarter. Majority opinion, 502 Pa. at 299, 466 A.2d at 115. Thus, while a claimant "on the Table" had to have earned 35%–38% of the qualifying wages outside of the high quarter, those who earned the maximum qualifying wage in one quarter had to have earned 0% of their wages in an outside quarter. As will be discussed more fully, *infra,* the pre-1964 scheme was clearly unconstitutional and an arbitrary measure of attachment to the labor force, since it measured attachment at a 35%–38% rate for lower paid claimants and *not at all* for higher paid. The majority finds the present statutory scheme valid, and the classifications *reasonably related to the goal of measuring* genuine attachment, because its predecessor classifications were *more unconstitutional.* Such reasoning is disturbing in its implications.

No one could dispute that a statutory classification that predicated eligibility for benefits on, say, the color of the claimant's eyes, stating that "claimants with brown or green eyes are not eligible for benefits," would be arbitrary and unconstitutional. If the legislature later amended the statute to permit brown-eyed claimants to collect benefits, does that classification have a "rational" basis because the old

statute was *more* arbitrary? Is the exclusion of a green-eyed claimant valid because the brown-eyed claimants are now eligible? This is, most certainly, an absurd example. It is not, I submit, any more absurd than the principle it illustrates, which principle has today been adopted by the majority—presently arbitrary classifications can be upheld as "rationally" based because an older classification was worse.

In my opinion, appellant is correct in arguing that the statutory classifications of unemployment compensation eligibility challenged herein are arbitrary and have no rational basis or reasonable relationship to the legitimate legislative decision to require claimants to be attached to the labor force. The crux of appellant's argument is that Part C of the Table operates to require claimants making $3,738.00 or less in their high quarters to have earned 35%–38% of their total base year wages in another quarter or quarters, while the Table and the "20% minimum rule" of section 401(a) allow those claimants earning more than $3,738.00 in their high quarters to qualify for benefits if as little as 20% of their base year wages are earned outside of the high quarter. These two methods of computing eligibility create, appellant asserts, classifications impermissible under the Equal Protection Clause.

Section 3 of the Act, 43 P.S. § 752 declares the public policy leading to its enactment:

Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of the Commonwealth. *Involuntary unemployment and its resulting burden of indigency* falls with crushing force upon the unemployed worker, and ultimately upon the Commonwealth and its political subdivisions in the form of poor relief assistance. *Security against unemployment and the spread of indigency* can best be provided by the systematic setting aside of financial reserves to be used as compensation for loss of wages by employes during periods when they become unemployed through no fault of their own. The principle of the accumulation of financial reserves, the sharing of risks, and the payment of compen-

sation with respect to unemployment meets the need of protection against the hazards of unemployment and indigency. The Legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this Commonwealth require the exercise of the police powers of the Commonwealth in the enactment of this act for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

One cannot glean from this declaration any justification for the classifications at issue. Rather than bearing a fair and substantial relation to the legitimate goals expressed in the declaration, the classifications work *against* those goals, for lower paid workers (those whose high quarterly wages are less than the Table maximum) would generally be closer to indigency than those who have been earning money beyond the maximum.

The principle argument advanced by the Commonwealth is that the financial qualification provisions of sections 401(a) and 404(e)(1), 43 P.S. § 801(a) and 804(e)(1), referred to by the Attorney General as "previous-work" requirements, are designed so that only those claimants who have demonstrated a "genuine attachment" to the labor force will be eligible to receive benefits, thereby helping to preserve the fiscal integrity of the unemployment compensation fund. I agree with the Commonwealth Court, and contrary to the majority's suggestion, appellant does not dispute, that both of these (i.e., benefits to be paid only to those who have displayed "genuine attachment", and "fiscal integrity") are legitimate legislative objectives. However, appellant's position is that creation of two *different* standards (and the resulting classifications) for determining attachment to the labor market and preserving the fiscal integrity of the fund is not rationally related to these purposes in a fair and substantial manner. I agree.

Before proceeding to an analysis of the Pennsylvania legislative scheme to assure that claimants are genuinely attached to the labor force, a brief review of the origins of

previous work requirements is in order. In 1936, Pennsylvania enacted its Unemployment Compensation Law in response to federal incentives in the Social Security Act.[4] The unemployment compensation system is basically an insurance program and, in such programs, it is appropriate that there be a period of time in which workers earn their rights and in which some contributions are paid in their behalf.[5] Most states have developed some type of qualification requirements and/or formula in order to test a claimant's attachment to the labor force.

As noted by the Attorney General, the "problem of devising previous-work requirements for unemployment compensation claimants has been very troublesome". Brief for Attorney General at 9. The source of this trouble lies in administrative and reporting difficulties, particularly the inability to obtain accurate information from the employers concerning an employe's actual time worked. (This informational deficiency was acute at the time the unemployment compensation laws were coming into being. As seen by the 1980 amendments to the Pennsylvania Act, section 404(c), 43 P.S. § 804(c), adopting "credit week" requirements, this problem has apparently been eliminated. *See* majority slip opinion at 5, note 5 and 31, note 21 and accompanying text.) As should be obvious, and as the Social Security Administration initially recommended, the most direct and accurate measure of attachment to the labor force is a formula that is a function of time, i.e., one which considers length and consistency of work during a given period. Brief for Attorney General at 9, n. 6. The length of time spent working is the preferred measure rather than formulae that are expressed as functions of earnings. *See Munts* article cited in

4. *See* Haggart, *Unemployment Compensation During Labor Disputes,* 37 Neb.L.Rev. 668, 668–674 (1958).

5. Most of this overview of "substantial attachment" requirements has been provided by the Attorney General who has relied extensively on a 1980 report issued by Professor C. Munts, Director of Research and Evaluation for the National Commission on Unemployment Compensation, entitled *Previous Work Requirements and the Duration of Benefits: Unemployment Compensation: Studies and Research.*

note 5, *supra* at 3. The latter measures, "statistical surrogate[s] for direct evidence of time worked", majority opinion at 114, were adopted because quarterly wage records were more readily available to state agencies than were records of time worked.

Pennsylvania has adopted one of the common variations of the formulae based on earnings—the "multiple of weekly benefits" method.[6] Under this method, qualifying wages are defined as some multiple of the weekly benefit rate; in Pennsylvania, the multiple is "40", but with a "minus $80.00" variation, as is explained in the majority opinion. According to Professor Munts, this method of determining attachment "has a powerful bias in favor of claimants with high weekly wages. Highly paid workers whose weekly benefits are limited by the maximum . . . can earn enough to qualify for the maximum weekly benefit in a *shorter period of* time than low-paid workers need." *Munts, supra* note 5, at 4. In Pennsylvania, this bias is exacerbated by the "20% minimum rule" which, the Board asserts, is *also* a "measure of the attachment of the individual to the labor market". Brief for appellee Board at 17. To illustrate this bias, consider the following examples:

Claimant 1 (hypothetical) earns $10.00 per hour and works 480 hours in her high quarter, or, earns $4,800.00 in that quarter. Since she is "off the Table", she must make at least 20% of her total base year wages outside of her high quarter. Thus, her qualifying wages are $6,000.00 (20% × 6,000.00 = $1,200.00; $6,000.00 – $1,200.00 = $4,800.00). In order to earn an additional $1,200.00, claimant 1 must work *120 hours outside* of her high quarter.[7]

---

6. Fourteen states utilize this type of formula; 15 states and the District of Columbia utilize a "multiple of high quarter earnings" test; 8 states use a "flat amount of earnings" test; and 13 states use a "weeks-of-work" formulation.

7. This hypothetical example, and the other examples to follow, are based upon application of the Table as it existed at the time appellant filed her claim. The principles illustrated by these examples hold true under the current Table, but some of the figures would be changed.

Claimant 2 (hypothetical) earns $7.00 per hour and, similarly, works 480 hours in her high quarter. (This was appellant's hourly rate of pay with her employer). Her high quarterly earnings are, therefore, $3,360.00 and, according to the Table, her qualifying wages would be $5,360.00. In order to qualify, claimant 2 would have had to have earned $2,000.00 outside of her high quarter (or 37.3% of her total base year wages), which would require *286 hours outside* of her high quarter.

Under the classifications created by the different standards for determining attachment to the labor force (a ratio of 35%–38% as established by the Table vs. the "20% minimum rule"), claimants who work equal numbers of hours in their high quarters (i.e., are equally "attached") receive disparate treatment solely on the basis of the rate of pay. Due to the formulae and the different pay rates, claimant 2 is required to work *166 additional hours outside* of her high quarter than is claimant 1, in order to qualify for benefits. Clearly, the use of different standards for higher paid vs. lower paid claimants is irrational and arbitrary, and bears no fair or substantial relation to the legitimate legislative decision to require claimants to demonstrate "genuine attachment" to the labor force. As dramatically illustrated by the above example, the use of two distinct methods/ratios utterly fails to achieve the goal of assuring attachment since a claimant with significantly fewer total base year hours and "outside high quarter" hours than a claimant with lower wages can be determined to be eligible for benefits, while the lower-paid claimant, with *demonstrably greater attachment to the labor force,* is determined to be ineligible.

In appellant's case, the same inequity results. Appellant worked 427 hours at $7.00 per hour for a high quarterly wage of $2,989.00. Her Table "qualifying wage" was, therefore, $4,800.00. Accordingly, to be eligible, she would have had to have worked *259 hours outside* of her high quarter (259 hours × $7.00 per hour = $1,813.00: $1,813.00 + $2,989.00 = $4,802.00: the applicable outside earnings/qualifying wage ratio is 37.7%). Since appellant had worked only

*206 hours outside* (approximately) of her high quarter, for additional earnings of $1,444.00, she was ineligible for benefits.

Claimant 3 (hypothetical), on the other hand, works 427 hours (the same as appellant) at $10.00 an hour for high quarterly wages of $4,270.00. The Table requires claimant 3 to make $6,000.00 qualifying wages (or 20%, whichever is greater—$6,000.00 is greater). Thus, claimant 3 must earn an additional $1,730.00 to qualify, or, must work *173 hours outside* of her high quarter (the applicable ratio of outside earnings/qualifying wage is 28.8%). Again, claimant 3 works *fewer* total hours and *fewer* hours outside of her high quarter than appellant, but is deemed eligible for benefits *despite demonstrably lesser attachment to the labor force.*

The Commonwealth Court attempted to demonstrate a rational relation between the classifications and the goal of limiting benefits to individuals with genuine attachment to the labor force by focusing on actual dollar amounts. That court stated:

> Upon reviewing the Table, it is clear that claimant has focused her analysis too narrowly by simply examining the comparative percentage amounts which must be earned outside of the higher quarter. Although the percentage amount required to be earned outside of the high quarter does decrease as high quarterly wages exceed the Table maximum, the employee must still earn a comparatively high *actual dollar amount.* The system devised by the legislature recognizes that, where an employee with a sporadic work pattern earns a high quarterly wage, exceeding the Table maximum, it will become increasingly difficult for him to continue to earn a substantial percentage (*e.g.,* 35 percent) of his overall compensation outside of his high quarter. Therefore, we are satisfied that a genuine attachment to the labor force can be shown by examining the actual dollars which must be earned outside of the high quarter, without requiring that those dollar amounts increase on a flat percentage scale. 63 Pa. Cmwlth. 207, 439 A.2d at 210.

Again, an illustration disproves this hypothesis. Claimant 4 (hypothetical), earning $3,738.00 highest quarterly wages, must earn $6,000.00 qualifying wages to be determined eligible for benefits—or 37.7% of total base year wages must have been earned outside of the high quarter. Claimant 5 (hypothetical), earns $4,800.00 highest quarterly wages and must also earn $6,000.00 qualifying wages—or 20% earnings outside of the high quarter. The total base year dollar amounts are equal and the *comparative* dollar amounts (i.e., the high quarter dollar amounts compared with the total base year dollar amounts) as a measure of distribution of wages actually demonstrates greater attachment to the labor force by claimant 4, since a far greater proportion of 5's wages are concentrated in the high quarter than are 4's. Even looking at the actual dollar amounts, therefore, instead of the relative percentages, it is apparent that the use of two separate systems to determine previous-work experience is not rationally related to the claimant's attachment to the labor force, and that the classifications are arbitrary.

Both the Board and the Attorney General place great reliance on the case of *Ertman v. Fusari,* 442 F.Supp. 1147 (D.Conn.1977) as it involved an equal protection challenge to the Connecticut Unemployment Compensation Law. The previous work requirements of that Act were of the "multiple of weekly benefits" variety, specifically, the multiple of 40 (the "forty" rule). Claimant there had argued that had he earned less in his highest quarter or had his weekly benefits been reduced from $89.00 to $66.00 per week, he would have been eligible for benefits under the "forty" rule. The federal district court held, at 442 F.Supp. 1151:

> it is not the function of the Court to strike down or alter the State's unemployment compensation eligibility standards because an incidental individual inequality results from its operation; the remedy rests with the legislature.... "General rules are essential if a fund of this magnitude is to be administered with a modicum of efficiency, even though such rules inevitably produce seemingly arbitrary consequences in some individual cases."

*Califano v. Jobst,* 434 U.S. 47, 53, 98 S.Ct. 95, 99, 54 L.Ed.2d 228 (1977). (further citations omitted).

That court held that the "forty" rule bore a reasonable relation to the legislative purpose of limiting the beneficiaries of the compensation fund to those claimants who were genuinely attached to the labor market. *Id.* at 1151.

However, the Board and the Attorney General both fail to point out that, unlike Pennsylvania's system, Connecticut did not utilize a counterpart to the "20% minimum rule". The "forty" rule formula is applied in Connecticut to *all* claimants, regardless of earnings, to determine if their distribution of wages demonstrates the requisite attachment. Conn. Gen.Stat. § 31–235. There is no arbitrary cut-off point on a Table that triggers more lenient eligibility requirements. Again, appellant herein does not challenge the use of formulae based on earnings to measure attachment; she challenges rather, the use of *different* formulae for different, but similarly situated, claimants.[8]

The majority offers two hypothetical claimants (A and B) to illustrate that inequity would remain if the legislative scheme were uniform and imposed a 35%–38% outside high quarter/total qualifying wages ratio "across the board". Majority opinion at 118. As previously explained, by controlling these claimants for "rate of compensation", the hypotheticals are irrelevant to our determination as the claimants are not then similarly situated vis á vis attachment to the labor force. These hypotheticals do serve to illustrate, however, the inherent inequality in the use of "surrogate" methods comparing *wages* earned in various periods instead of actual time worked. *Munts, supra* note 5, at 3–4. This inevitable disparity in such a system may well

---

**8.** The Attorney General also advances several other purported legislative objectives for the use of different criteria to determine financial eligibility: 1) that the criteria are designed to exclude "new entrants" to the work force from receiving benefits; 2) that it is "appropriate" to require claimants to earn coverage; and 3) that the classifications "test claimants' work-oriented motives". These "objectives" are simply sub-categories of the goal of requiring "genuine attachment", *see Munts, supra* note 5 (relied on by the Attorney General), and there is no need to address the arguments separately.

be the sort of imprecision that is tolerated by the Equal Protection Clause even though the calculation of eligibility is "not made with mathematical nicety or because in practice it results in some inequality." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). As noted, the "multiple of 40" rule adopted by the Connecticut legislature withstood an equal challenge for that reason. *Ertman v. Fusari, supra.*[9]

Once again, we are not here faced with an equal protection challenge to the validity of proportionality or multiple of weekly benefits formulae *generally,* and the possible existence of some inequity or imprecision in the multiple of forty formula is *irrelevant* to the determination of whether classifications created by the adoption of two different schemes—both purported to measure attachment to the same labor force, but at different rates—are valid. Once again, two wrongs do not make a right.

Also asserted as a legitimate legislative objective of the classifications by the Commonwealth, and adopted by the Commonwealth Court, is the preservation of the fiscal integrity of the unemployment compensation fund. There is no doubt that this is a legitimate legislative objective. However, "financial expediency alone does not justify an invidious discrimination." *Foster v. UCBR,* 47 Pa.Commw. 441, 408 A.2d 216, 219 (1979) and *see Wallace v. UCBR,* 38 Pa.Commw. 342, 393 A.2d 43, 47 (1978). In *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 493, 97 S.Ct.

9. An argument could reasonably be made that even this inevitable inequality with such "surrogate" measures of attachment is intolerable since less drastic means now exist, *and have been implemented by the legislature,* which demonstrate attachment by reference to actual time worked. The less drastic means were adopted in 1980, section 404(c), 43 P.S. § 804(c) (establishing a minimum of 18 credit weeks worked in a claimant's base year regardless of amount of qualifying wages). *See* majority opinion, 502 Pa. 287, 305, 466 A.2d at 109, 119, notes 5 and 21 and accompanying text. *See Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (no need for state to use particular statutory scheme resulting in discriminatory classifications where less drastic means existed and were employed to accomplish objectives).

1898, 1910, 52 L.Ed.2d 513 (1977), the United States Supreme Court stated:

> It is clear that protection of the fiscal integrity of the [unemployment compensation] fund is a legitimate concern of the State. We need not consider whether it would be "rational" for the State to protect the fund through a random means, such as elimination from coverage of all persons with an odd number of letters in their surnames.

In the instant case, while the means selected by the legislature to ensure the fiscal integrity of the fund (by requiring genuine attachment to the labor force) is not as obviously random as even/odd number of letters in surnames, or the color of claimants' eyes, the lower paid/higher paid dichotomy created by the Act is nevertheless arbitrary and does not bear a fair and substantial relation to the legislative objectives. If the "20% minimum rule" is sufficient to preserve the fiscal integrity of the fund when dealing with higher paid claimants, there is no perceptible justification for "preserving the fund" at a 35%–38% rate for lower paid claimants. And if fund preservation is a goal behind the classifications, then there is no reasonable relation to that goal in *relaxing* the eligibility standards for those claimants who will receive the *maximum* amount of benefits.[10]

Finally, the Attorney General makes his own two wrongs make a right argument. He suggests that an inequity has been visited upon higher paid claimants, stating "the continuation of the 37% requirement for those who earned above $3,738.00 in 1979 would have been *unfair in light of the fact that the legislature has placed a maximum upon the weekly benefit rate and the total amount of compensation for those who earned above $3,738.00 in 1979.*" Brief for Attorney General at 24. (Emphasis in original). Apparently, the Attorney General perceives the "20% minimum rule" as a

---

**10.** At oral argument, in response to questioning from the bench, the Attorney General specifically denied that invalidation of the dual monetary eligibility requirements of the Act would significantly impair the fiscal integrity of the unemployment compensation fund. Any adverse impact on the fund caused by such an invalidation would be significantly muted by the 1980 "credit weeks" amendments. *See* note 9, *supra.*

sort-of "quid pro quo" for this "unfairness" and suggests that, to "make it up" to the higher paid claimants, the legislature decided "to simplify the relationship between high quarter wages and qualifying wages for those who earn more than the amounts on the Section 404(e)(1) Table. . . . [The "20% minimum"] test is easy to administer, does not require extension of the Section 404(e)(1) Table ad infinitum and greatly simplifies the relationship between high quarter wages and qualifying wages for those who earn more than the . . ." maximum Table amounts.

There is no "inequality" in such a system. Unemployment benefits are not intended to operate as alimony payments operate to maintain the recipient in the manner to which he or she is accustomed. The purpose is, rather, to stave off indigency during temporary periods of unemployment. Section 3, 43 P.S. § 752. The legislature has determined that such goal can be achieved by establishing a maximum rate of 66⅔% of the statewide average weekly wages. Section 404(e)(2), 43 P.S. § 804(e)(2). Even if this capping of benefits were, somehow, inequitable to higher paid wage earners, the legislature cannot cure one inequity by creating another. Moreover, the *contributions to* the unemployment compensation fund are capped as well, section 4(x)(1), 43 P.S. § 753(x)(1), so that contributions by an employer are *not* made on portions of a claimant's salary for which there will be no proportionatly increased benefits paid. (The current "cap" on contributions is $6600.00. No payments to the fund results from any earnings in excess of this amount).

Furthermore, it is difficult to imagine how the application of a 20% rate is any "simpler" than the application of a 38% rate or, if the Table were extended as it could easily be by simple extrapolation of the formula, by looking at the Table and reading across to Part C. This "matching-inequalities" argument does not provide a rational basis for the classifications involved.

For the foregoing reasons, I would hold that the classifications created by the operation of the section 404(e)(1) Table ("35%–38%") and the section 401(a) "20% minimum rule" are invidious as they are unreasonable and arbitrary as they do

not exhibit a fair and substantial relation to the legitimate objectives of the Unemployment Compensation Law. Inasmuch as the legislature has selected the "20% minimum" as a sufficient indicator of attachment to the labor force,[11] the far more stringent eligibility requirements contained in the Table (35%–38%) violate the guarantee of equal protection of the laws to those claimants governed by the latter. Accordingly, I would declare Part C ("qualifying wages") of the section 404(e)(1) Table, 43 P.S. § 804(e)(1), to be clearly, palpably and plainly unconstitutional, reverse the opinion and order of the Commonwealth Court, and remand the matter to the Unemployment Compensation Board of Review for computation of benefits consistent with this opinion.

FLAHERTY, J., joins in this dissenting opinion.

11. The "20% minimum rule" in 401(a)(1) is a measure of attachment of the individual to the labor market." Brief for appellee Board at 17.